419 A.2d 431

**Lois E. LUKUS, on behalf of herself and all others similarly situated,**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, a corporation; International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, an unincorporated association; and International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC, Local 601, an unincorporated association.**

**Appeal of WESTINGHOUSE ELECTRIC CORPORATION.**

Superior Court of Pennsylvania.

Argued April 12, 1979.

Filed Jan. 4, 1980.

234

236

Martha Hartle Munsch, Pittsburgh, for Westinghouse, appellant.

Michael D. Buchwach, Pittsburgh, for Lukus, appellee.

Michael B. Trister, Washington, D. C., for union, appellees.

Before CERCONE, President Judge, and VAN der VOORT, SPAETH, WIEAND and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from an order dismissing preliminary objections by Westinghouse Electric Corporation to a complaint filed by Lois E. Lukus as a class action[1] against

1. The members of the class are described as "all past, present and future female Westinghouse employees in Pennsylvania who, since July 9, 1969, while Westinghouse employees, were or will be absent from work due to disability from pregnancy, childbirth and complications therefrom, and who have not received and will not receive sickness and accident payments for said absences." Record at 5a.

Westinghouse, alleging the violation of rights of female Westinghouse employees under the Pennsylvania Human Relations Act, Act of Oct. 27, 1955, P.L. 744, *as amended*, 43 P.S. § 951 *et seq.* (hereinafter the PHRA).[2]

In her complaint Lukus alleges that while she was employed by Westinghouse, from September 1972 to June 30, 1976, Westinghouse provided its employees "with weekly sickness and accident payments, for a maximum period of twenty–six (26) weeks, for all absences from work due to all disabling non–occupational sicknesses and accidents, except absences from work by female employees disabled by pregnancy or childbirth or complications therefrom." Record at 4a. Lukus further alleges in her complaint that she "was absent from work from approximately October 1975 to March 26, 1976 because of disability due to pregnancy, complications of pregnancy and childbirth," *id.*, and that because of Westinghouse's policy, she did not receive sickness and accident benefits for this period of disability. The theory of the complaint is that Westinghouse's refusal to pay Lukus benefits during her absence due to pregnancy and childbirth constituted sex discrimination prohibited by the PHRA. The complaint prays that Westinghouse be enjoined from "pursuing, using, implementing, adhering to, or agreeing to" any employee sickness or accident plan that excepts from its otherwise all–inclusive coverage pregnancy–related disabilities. The complaint also prays that Westinghouse's plan be declared unlawful, and that monetary damages be awarded.

On September 1, 1977, Westinghouse filed preliminary objections to the complaint, including objections that

2. The complaint also names as defendants the International Union of Electrical, Radio and Machine Workers, and Local 601 of that union. The complaint alleges that the unions were Lukus's collective bargaining representatives while she was a Westinghouse employee, and were parties to collective bargaining agreements with Westinghouse that fixed the terms and conditions of her employment. The unions contend in their answer to the complaint that they were improperly named as defendants because they have no adversary relationship with Lukus or the class she purports to represent, Record at 8a, and on this appeal they have argued in support of the decision of the lower court.

1. the federal Employee Retirement Income Security Act, Act of Sept. 2, 1974, P.L. 93–406, 88 Stat. 832, 29 U.S.C. §§ 1001, *et seq.* (hereinafter ERISA), has preempted PHRA's regulation of Westinghouse's employee disability plan;

2. PHRA, by its own terms, does not apply to Westinghouse's plan;

3. Lukus has failed to exhaust her administrative remedies under PHRA; and

4. Lukus is barred by § 962(b) of PHRA from maintaining her action because she previously filed a complaint in federal court based upon the same grievance.[3]

In response, Lukus filed preliminary objections to Westinghouse's preliminary objections, and ultimately an answer to Westinghouse's factual averments. Record at 74a. On April 20, 1978, the lower court dismissed both Westinghouse's and Lukus's preliminary objections. On May 8, 1978, pursuant to 42 Pa.C.S.A. § 702(b) (1979 Pamphlet) and Pa.R.A.P. 1311, the lower court amended its April 20 order to certify that it believed that its dismissal of Westinghouse's preliminary objections involved "controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal therefrom may materially advance the ultimate termination of this litigation." Record at 2a. On June 5, 1978, Westinghouse petitioned this court for permission to appeal from the lower court's order, stating that if permission were granted, the appeal would challenge only the lower court's dismissal of the four objections listed above. On July 26, 1978, we granted the petition.[4] On October 26, 1978, argument was

---

**3.** Westinghouse also filed other preliminary objections, which were dismissed by the lower court, *e. g.*, laches, the failure to join necessary and indispensable parties, and objections concerning the scope of the plaintiff class. On this appeal, however, we shall consider only the four objections listed above in the Text. *See* discussion *infra.*

**4.** In addition to petitioning for permission to appeal from an interlocutory order, Westinghouse filed a separate appeal pursuant to the Act of March 5, 1925, P.L. 23, § 1, 12 P.S. § 672, *repealed by* the

heard on the appeal by a three-judge panel of this court, but because of the considerable importance of the issues, argument was rescheduled and heard before the court en banc on April 12, 1979. For the reasons below, we now affirm in part and vacate in part the lower court's order, and remand for further proceedings in accordance with this opinion.

I.

■ Westinghouse's first preliminary objection is that "ERISA . . . has preempted PHRA's regulation of Westinghouse's employee disability plan." The premises of this objection may be stated as follows: Congress enacted ERISA to afford comprehensive federal protection of the interests of participants in employee benefit plans.[5] There

Judiciary Act Repealer Act, Act of April 28, 1978, P.L. 202, No. 53, 42 Pa.C.S.A. § 20002(a) [1069] (1979 Pamphlet) (eff. June 27, 1980). This Act allows an appeal to be taken from an order involving a "question of jurisdiction over the defendant or of the cause of action for which the suit is brought . . . as in cases of final judgments." Thus, to the extent that Westinghouse's preliminary objections raise jurisdictional questions, this court's power to hear the appeal is based on both 12 P.S. § 672 and 42 Pa.C.S.A. § 702(b). Both appeals have been docketed at the same court and term number and this opinion disposes of both.

5. In enacting ERISA, Congress exercised its powers under article I, section 8 of the United States Constitution. 29 U.S.C. § 1001 recites:

(a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; that they have become an important factor in commerce because of the interstate character of their activities, and of the activities of their participants, and the employers, employee organizations, and other entities by which they are established or maintained; that a large volume of the activities of such plans is carried on by means of the mails and instrumentalities of interstate commerce; that owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and adminis-

is no dispute that Westinghouse's employee disability plan is an "employee welfare benefit plan" within 29 U.S.C. § 1002(1),[6] and is subject to the provisions of ERISA.[7] State

tration of such plans; that they substantially affect the revenues of the United States because they are afforded preferential Federal tax treatment; that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

(b) It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

(c) It is hereby further declared to be the policy of this Act to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance.

6. 29 U.S.C. § 1002(1) provides:

(1) The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

Westinghouse is an "employer" under 29 U.S.C. § 1002(5), and the international and local unions are "employee organizations" under 29 U.S.C. § 1002(4).

regulation of the plan, by the PHRA, is therefore controlled by the preemption, or supersedure, provision in 29 U.S.C. § 1144, which provides:

(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . .

\* \* \* \* \* \*

(c) For purposes of this section:

(1) The term "State law" includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State. . . .

(2) The term "State" includes a State, any political subdivisions thereof, or any agency or instrumentality of either, which purports to regulate, directly or indirectly, the

7. 29 U.S.C. § 1003 provides:
 (a) Except as provided in subsection (b) of this section and in sections 1051, 1081, and 1101 of this title, this subchapter shall apply to any employee benefit plan if it is established or maintained–
 (1) by any employer engaged in commerce or in any industry or activity affecting commerce; or
 (2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or
 (3) by both.
 (b) The provisions of this subchapter shall not apply to any employee benefit plan if–
 (1) such plan is a governmental plan (as defined in section 1002(32) of this title);
 (2) such plan is a church plan (as defined in section 1002(33) of this title) with respect to which no election has been made under section 410(d) of Title 26;
 (3) such plan is maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws;
 (4) such plan is maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens; or
 (5) such plan is an excess benefit plan (as defined in section 1002(36) of this title) and is unfunded.
 None of the exceptions in section 1003(a), (b) applies to this case.

terms and conditions of employee benefit plans covered by this subchapter.[8]

This preemption must be given effect, for it constitutes an exercise by Congress of its powers under article VI, clause 2, of the United States Constitution (the supremacy clause).[9]

■ The general principles that we must apply in appraising Westinghouse's preliminary objection are settled. "[W]hen Congress has 'unmistakably . . . ordained,' . . . that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51

8. Subsection (b) of this provision establishes certain exceptions to the provision's general preemption of state law, but Lukus concedes that none of the exceptions applies here. Section 1144(b) provides:

 (b)(1) This section shall not apply with respect to any cause of action which arose, or any act or omission which occurred, before January 1, 1975.

 (2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

 (B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

 (3) Nothing in this section shall be construed to prohibit use by the Secretary of services or facilities of a State agency as permitted under section 1136 of this title.

 (4) Subsection (a) of this section shall not apply to any generally applicable criminal law of a State.

9. Article VI, clause 2, provides:

 This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

L.Ed.2d 604 (1977). *Accord: Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978) (plurality opinion). However, in deciding whether Congress *has* "unmistakably . . . ordained" that its enactment supersedes a state's law, a court is to proceed with caution; it must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), *quoting Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). "This assumption provides assurance that 'the federal–state balance,' . . . will not be disturbed unintentionally by Congress or unnecessarily by the courts." *Jones v. Rath Packing Co., supra*, 430 U.S. at 525, 97 S.Ct. at 1309.[10] "Unless the requisite pre–emptive intent is abundantly clear, we should hesitate to invalidate state and local legislation for the added reason that 'the state is powerless to remove the ill effects of our decision, while the national government, which has the ultimate power, remains free to remove the [state] burden." *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 643, 93 S.Ct. 1854, 1864, 36 L.Ed.2d 547 (1973) (REHNQUIST, J., joined by STEWART, WHITE and MARSHALL, JJ., dissenting) (citation omitted). Moreover, we are to bear in mind that "each case turns on the peculiarities and special features of the federal regulatory scheme in question." *City of Burbank v. Lockheed Air Terminals, Inc., supra* at 638, 93 S.Ct. at 1862.

Without doubt, the preemptive effect of section 1144 is quite broad. The United States Supreme Court has intimat-

10. This principle of federal–state balance has been stated elsewhere as follows: "Federal law is generally interstitial in nature . . . . Congress acts . . . against the background of the total *corpus juris* of the states in much the same way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation." Hutchison and Ifshin, *Federal Preemption of State Law Under the Employee Retirement Income Security Act of 1974*, 46 Chi.L.Rev. 23, 35 (1978), *quoting* P. Bator, P. Mishkin, D. Shapiro, and H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 470–71 (2d ed. 1973).

ed as much in *Malone v. White Motor Corp.,* (plurality opinion), *supra,* 435 U.S. at 512, 98 S.Ct. at 1193 (plurality opinion), and other federal courts have consistently so held, *see e. g., Wadsworth v. Whaland,* 562 F.2d 70, 76–77 (1st Cir.1977), *cert. denied,* 435 U.S. 980–81, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978); *Bell v. Employee Security Benefit Ass'n,* 437 F.Supp. 382 (D.Kan.1977); *Wayne Chemical, Inc. v. Columbus Agency Service Corp.,* 426 F.Supp. 316 (N.D.Ind.), *modified and affirmed,* 567 F.2d 692 (7th Cir.1977).[11] This general conclusion, however, is not dispositive of the case before us.[12] We must still decide whether the preemptive

**11.** The conclusion that the presumptive effect of section 1144 is quite broad is also supported by legislative history. *See* 120 Cong.Rec. 29197, 29933, 29942 (1974) (comments of Senator williams and Representative Dent, floor managers of ERISA during Congressional debate), and 119 Cong.Rec. 29902 (1973) and 120 Cong.Rec. 4742 (1974) (reprinting early drafts of ERISA that contain preemption provisions narrower than section 1144).

**12.** It appears from legislative history that Congress itself does not know just how broad is the preemptive effect of section 1144. Thus Senator Javits, in introducing the ERISA Improvements Act of 1979, S.209, 96th Cong., 1st Sess. (1979), stated:

When the broad preemption language of the ERISA conference report was enacted, I realized that further attention to this area would be necessary as experience revealed the outer contours of the preemption doctrine.

125 *Cong.Rec.* S. 575 (daily ed. Jan. 24, 1979).

This statement may be contrasted with Senator Javits's remarks during the 1974 debates on ERISA:

Although the desirability of further regulation–at either the State or Federal level–undoubtedly warrants further attention, on balance, the emergence of a comprehensive and persuasive federal interest and the interests of uniformity with respect to interstate plans required–but for certain exceptions–the displacement of State action in the field of private employee benefit programs. 120 Cong.Rec. 29942 (1974).

It is interesting that Senator Javits's ERISA Improvements Act of 1979 adds certain exceptions to section 1144's general preemption of state law that are already recognized by the courts. It is also interesting that Senator Javits decided not to address in the ERISA Improvements Act the question of ERISA's preemption of state sex discrimination laws "because passage of the pregnancy sex discrimination amendments [to the Equal Employment Opportunity Act–*see* Discussion *infra* at 440] appears to have mooted the issue of preemption of State laws requiring disability plans to cover pregnancy–related leave." 125 Cong.Rec. S. 575 (daily ed. Jan. 24, 1979). Here, however, we are confronted with a case that has not been mooted by

effect of section 1144 is *so* broad that it "unmistakably" extends to the PHRA.

It will be recalled that the preemptive language of section 1144 is that ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." As one considers this language, it becomes evident that the question we must answer is, What do the words "relate to" mean?

Plainly, the words "relate to" are ambiguous. Do they mean, relate to in *any*, even the most indirect, way, or only in an *intimate*, very direct, way? In other words, are they to be read broadly, or narrowly? The gist of Westinghouse's argument is that they are to be read broadly.

■ Initially it may be noted that Westinghouse's argument is contrary to the general principle that we should "start with the assumption," *Rice v. Santa Fe Elevator Corp., supra*, that in enacting ERISA, Congress did not intend to preempt the PHRA. Given that assumption, it follows that if preemption may be avoided by construing a statute narrowly, then we should construe the statute narrowly.

The conclusion that we should approach the problem before us in this manner is supported by the cases, which have consistently examined how intimate was the relationship between ERISA and the state law in question. If the relationship was intimate, in that a state law had attempted to regulate areas explicitly governed by the provisions of ERISA, courts have not hesitated to hold that the state law was preempted by section 1144. *See, e. g., National Carrier's Conference Comm. v. Heffernan*, 454 F.Supp. 914 (D.Conn.1978) (state tax specifically directed at employee welfare benefit plans preempted); *In re C.D. Moyer Company Trust Fund*, 441 F.Supp. 1128 (E.D.Pa.1977), *aff'd without opinion* 582 F.2d 1273 (3d Cir.1978) (state law providing order of distribution of plan assets upon plan's termination

the passage of the amendments to the Equal Employment Opportunity Act.

preempted); *Hewlett–Packard Co. v. Barnes*, 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd* 571 F.2d 502 (9th Cir.), *cert. denied*, 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978) (overlapping state regulation of welfare benefit plans preempted); *Azzaro v. Harnett*, 414 F.Supp. 473 (S.D.N.Y.1976), *aff'd without opinion*, 553 F.2d 93 (2d Cir.), *cert. denied*, 434 U.S. 824, 98 S.Ct. 71, 54 L.Ed.2d 82 (1977) (state Department of Insurance powerless to conduct inquiry into the pension benefit status of a participant in the fund). In instances, however, where a state law relating primarily to matters not governed by ERISA only indirectly affected employee benefit plans, that is, in a way not in conflict with the purposes ERISA was designed to achieve, courts have usually held that the state law was not preempted. Thus, most courts, including this one, have held that state domestic relations laws are not preempted by section 1144, and that employee pension benefits may therefore be garnished to satisfy court–ordered support payments, or divided pursuant to state community property laws. *See, e. g., AT&T v. Merry*, 592 F.2d 118 (2d Cir.1979); *Operating Engineers Local #428 v. Zamborsky*, 470 F.Supp. 1174, 5 Fam.L.Rep. (BNA) 2654 (D.C.Ariz.1979); *Cartledge v. Miller*, 457 F.Supp. 1146 (S.D. N.Y.1978); *Cody v. Riecker*, 454 F.Supp. 22 (E.D.N.Y.1978), *aff'd*, 594 F.2d 314 (2d Cir.1979); *Stone v. Stone*, 450 F.Supp. 919 (N.D.Cal.1978); *General Dynamics Corp. v. Harris*, 581 S.W.2d 300, 5 Fam.L.Rep. (BNA) 2644 (Tex.Civ.App.10th Dist., 1979); *Western Electric Co. v. Traphagen*, 166 N.J.Super. 418, 400 A.2d 66, 5 Fam.L.Rep. (BNA) 2541 (App.Div. 1979); *Commonwealth ex rel. Magrini v. Magrini*, 263 Pa.Super. 366, 398 A.2d 179 (1979); *Johnston v. Johnston*, 5 Fam.L.Rep. (BNA) 2045 (Cal.Ct.App.2d Dist., filed 10/27/78); *Johns v. Retirement Fund Trust*, 5 Fam.L.Rep. (BNA) 2117 (Cal.Ct.App. 4th Dist., filed 10/13/78; *Biles v. Biles*, 5 Fam.L.Rep. (BNA) 2054 (N.J.Super.Ct. Chancery Div., filed 10/2/78). *But see Francis v. United Technologies Corp.*, 458 F.Supp. 84 (N.D.Cal.1978); *Kerbow v. Kerbow*, 421 F.Supp. 1253 (N.D.Tex.1976).

■ Here, it is evident that the relationship of the PHRA to ERISA is not intimate but indirect. ERISA is primarily concerned with the *delivery* of benefits–with "the soundness and stability of plans"[13]–whereas the PHRA is primarily concerned with the *identification* of the beneficiaries of the plans.[14] As we try to strike the proper "'federal–state balance,'" *Jones v. Rath Packing Co., supra,* this indirect relationship is by itself a powerful reason for concluding that when Congress enacted ERISA, it did not intend to preempt a state law, such as the PHRA, forbidding sex discrimination.[15]

13. *See generally* 29 U.S.C. § 1001, quoted n.5 *supra.* Moreover, although pension plans must comply with all the provisions in ERISA, employee welfare benefit plans need only comply with ERISA's reporting and disclosure provisions and observe the Act's fiduciary standards. *See* 29 U.S.C. §§ 1051(1), 1081(a)(1); *see also* Hutchison & Ifshin, *supra* at 30.

14. In saying this we recognize that to a limited extent the legislative history of ERISA reflects concern with identification of beneficiaries. *See* comments of Senator Williams at 120 Cong.Rec. 29933 (1974):

It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law. Consistent with this principle, State professional associations acting under the guise of State–enforced professional regulation, should not be able to prevent unions and employers from maintaining the types of employee benefit programs which Congress has authorized–for example, prepaid legal services programs–whether closed or open panel–authorized by Public Law 93–95.

*See also* 120 Cong.Rec. 29948–49 (1974) (comments of Senator Taft).

15. Subsequent to ERISA's enactment, Senators Williams and Javits, during debate on the Age Discrimination in Employment Act Amendments of 1978, P.L. 95–256, 92 Stat. 189 (approved April 6, 1978), stated their belief that state age discrimination laws were preempted by ERISA:

"Mr. JAVITS. Finally, Mr. President, it is understood that just as these age discrimination amendments do not interfere with ERISA, State age discrimination in employment laws also are not to interfere with ERISA. The ADEA itself, as pointed out in the Senate report, does not preempt such State age discrimination laws. However, there should be no question that the preemption

In fact, however, we need not rely only on the general principles we have so far discussed. While they all lead to the conclusion that section 1144 should be construed narrowly, so as to avoid preemption of the PHRA, any doubt is removed by the legislative history, which shows that ERISA was enacted only upon assurance by the floor managers that laws forbidding sex discrimination would not be preempted. The critical exchange during Senate debate occurred between Senator Mondale and Senator Williams:

Mr. MONDALE. Mr. President, for some months I have been deeply concerned with the need to insure that pension benefits are made available on a nondiscriminatory basis to all those who have earned them regardless of race, color, national origin, religion, or sex.

The chance to achieve economic security—based on merit—is the heart of the American dream; and where pension benefits are unfairly reduced or denied, the results are tragic for those who have earned a dignified retirement.

I had intended at this time to raise my amendment incorporating nondiscrimination based on race, color, na-

---

rules of section 514(a) of ERISA shall be determinative regarding the preemption of State age discrimination laws which directly or indirectly establish requirements relating to employee benefit plans. ERISA's preemption of State age discrimination laws shall be determined without regard to section 514(d) of ERISA or the fact that the ADEA does not itself preempt State law."

Mr. WILLIAMS. I concur in my friend's basic opinions as they accurately state the underlying principles of law in this regard federal law will preempt State age discrimination statutes only to the extent that these laws relate to an employment benefit plan described in section 3(1) of ERISA and are not exempt under 514(a) and (b) of ERISA.

124 Cong.Rec. S. 4451 (daily ed. 3/23/78). typographical error corrected 124 Cong.Rec. S. 4767 (daily ed. 4/4/78).

However, for the reasons stated below at footnote 20, we do not find these views on ERISA's preemption of state age discrimination laws controlling on the issues presented here.

It may also be noted that one federal court has ruled that ERISA precludes states from requiring that employee disability plans include coverage for the diagnosis and treatment of alcohol and drug abuse. Standard Oil Co. of Calif. v. Agsalud, 442 F.Supp. 695 (N.D.Cal.1977). This holding would be overruled, however, by the passage of the ERISA Improvements Act of 1979. See footnote 12 supra.

tional origin, religion, or sex into the basic requirements of the pending bill.

However, I understand that the distinguished Senator from New Jersey (Mr. WILLIAMS) is concerned that this approach runs counter to our actions last year in futher consolidating equal employment jurisdiction in the Equal Employment Opportunity Commission.

Mr. WILLIAMS. The Senator is correct. Although I fully share your concern for full enforcement of nondiscrimination requirements affecting pension and profit-sharing plans, I believe that the thrust toward centralized administration of nondiscrimination in employment must be maintained. And I believe this can be done by the Equal Employment Opportunity Commission under terms of existing law.

Mr. MONDALE. Does the Senator agree that discrimination based on race, color, national origin, religion, or sex affecting participation in pension or profit-sharing plans, is presently prohibited under section 703(a) of the Equal Employment Opportunity Act? That section provides, in part:

It shall be an unlawful employment practice for an employer–

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religions, sex, or national origin–

Mr. WILLIAMS. I agree with the Senator's reading of the statute and I understand that the courts are following this view. The leading cases are: *Rosen v. Public Service Commission*, 477 F.2d 90 (3 Cir. 1973); *Bartmess v. Drewrys*, 444 F.2d 1186 (7th Cir. 1971) Cert. Denied 404 U.S. 939, [92 S.Ct. 274, 30 L.Ed.2d 252]; *Fillinger v. East Ohio Gas*, 4 FEP 73 (E.D.Ohio 1971).

Again, I share the concerns of the distinguished Senator from Minnesota that the EEOC must view discrimination in pension plans as among the most serious forms of

employment discrimination. And I will be glad to join the Senator from Minnesota in impressing this view on the new chairman–designate of the Commission, Mr. POW-ELL, when he appears before the Committee on Labor and Public Welfare for confirmation.

Mr. MONDALE. Mr. President, the distinguished Senator from New Jersey, the chairman of the Committee on Labor and Public Welfare and of the Labor Subcommittee, is the principal architect of the Equal Employment Opportunity Act and of the pending bill. I deeply appreciate his judgment and his assistance.

In light of the Senator's views, and with the understanding that nondiscrimination in pension and profit–sharing plans is fully required under the Equal Employment Opportunity Act, I will not propose my amendment at this time.

119 Cong.Rec. 30409–410 (1973).[16]

It may be suggested that this exchange does not in fact represent an assurance that laws such as the PHRA would not be preempted, since in the exchange there is no reference to state laws but only to the Equal Employment Opportunity Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* This suggestion, however, overlooks the relationship between, on the one hand, ERISA, and on the other, Title VII and state laws, such as the PHRA. For its part, ERISA saved federal statutes, such as Title VII. 29 U.S.C. § 1144(d) provides:

Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law.

In turn, Title VII saved state laws, such as the PHRA, and established a Congressional policy of joint federal–state regulation in the area of employment discrimination. 42 U.S.C. § 2000e–7 provides:

16. An almost identical exchange occurred during House debate between Representative Abzug and Representative Dent. 120 Cong. Rec. 4726 (1974).

Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.[17]

Legislative history shows that 42 U.S.C. § 2000e–7 and other provisions of Title VII were drafted " 'to keep primary, exclusive jurisdiction [over discrimination complaints] in the hands of State commissions for a sufficient period of time to let them work out their own problems at the local level.' " *Moore v. Sunbeam Corp.*, 459 F.2d 811, 825 n. 34 (7th Cir. 1972) (STEVENS, J.), *quoting* Senator Dirksen at 110 Cong. Rec. 13087 (1964). This policy "to avoid federal action whenever possible by making the state a partner in the enforcement of Title VII" is a "fundamental policy" of the Act. *EEOC v. Wah Chang Albany Corp.*, 499 F.2d 187, 189 (9th Cir. 1974).

Thus, Title VII does not save state sex discrimination laws merely as a matter of comity to allow states to manage their own affairs without due federal intervention; rather, Title VII substantively incorporates those laws into the federal statutory scheme and uses them to vindicate federal policies. Not only does Title VII authorize the Equal Employment Opportunity Commission (hereinafter the EEOC) to cooperate with state agencies in joint projects, *see* 42 U.S.C. § 2000e–8(b), it provides that if state remedies exist for an allegedly discriminatory employment practice, no charge may be filed with the EEOC until sixty days after the commencement of state proceedings on the charge. *See* 42 U.S.C. § 2000e–5(c) and (d). This last requirement has led to

---

**17.** *See also* 42 U.S.C. § 2000h–4, which provides:

Nothing contained in any title of this Act shall be construed as indicating an intent on the part of Congress to occupy the field in which any such title operates to the exclusion of State laws on the same subject matter, nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act or any provision thereof.

the development of an extensive deferral arrangement between the EEOC and state enforcement agencies. *See* 29 C.F.R. § 1601.13–.15 (1978). In addition, 42 U.S.C. § 2000e–5(b) directs the EEOC to accord substantial weight to final findings and orders made by state authorities in its own investigation of whether reasonable cause exists to believe a charge of unlawful employment discrimination. Furthermore,

> legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination. In the Civil Rights Act of 1964, 42 U.S.C. §§ 2000a *et seq.*, Congress indicated that it considered the policy against discrimination to be of the 'highest priority.' . . . Consistent with this view, Title VII provides for consideration of employment–discrimination claims in several forums [the EEOC, state and local agencies, and federal courts]. . . . And, in general, submission of a claim to one forum does not preclude a later submission to another. Moreover, the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes."
>
> *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47–48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974) (footnotes and citations omitted).

*See also United States v. Sweet Home Central School Dist.*, 407 F.Supp. 1362 (W.D.N.Y.1976).

Were we to accept Westinghouse's argument, that even though saved by Title VII, the PHRA was preempted by ERISA, we should infringe upon this federal–state partnership. Fundamental policies of Title VII (the placement of primary, exclusive jurisdiction of employment discrimination complaints in state agencies and the provision of overlapping state and federal remedies against discrimination) would be compromised, and the speedy resolution of employment discrimination complaints under Title VII would be jeopar-

dized. In states having sex discrimination laws, such as Pennsylvania, employees attacking discriminatory benefit plans would no longer be allowed to secure relief from state authorities, even though under 42 U.S.C. § 2000e–5(c) they would still be required to institute state proceedings before filing charges with the EEOC. Conversely, the EEOC would not be permitted to act on the employees' charges prior to the expiration of sixty days following the commencement of the state proceedings, unless the proceedings were terminated sooner.

These compromises of Title VII's policies would occur without furthering any of the purposes of ERISA. By enacting section 1144, Congress desired to prevent inconsistent state regulation of employee benefit plans. Yet, in instances where a state sex discrimination law demands no more and no less of employers than Title VII demands, the threat of inconsistent regulation does not exist.[18] We are unwilling to believe that Congress, which has indicated that it considers its policy against employment discrimination "to be of the 'highest priority,' " *Alexander v. Gardner–Denver*

**18.** Westinghouse argues that Congress intended that a uniform body of common law be developed by federal courts on issues involving sex discrimination in employee benefit plans so that the plans would not be subjected to the inconsistent demands of the fifty states. Appellant's Brief at 31, 43, 45, 46, 49; Appellant's Reply Brief at 18, 20, 22, 26.

Although Westinghouse asserts at one point that "[e]ven if the [employee benefit] plan did not comply with federal law, that is a matter to be pursued under federal law–not state law," Appellant's Brief at 46, it fails to support its assertion by referring to legislative history or by postulating any legislative goal that would be served by such a rule. If the demands imposed by a state sex discrimination law on employee benefit plans are identical to the demands imposed by federal law, then whether a prosecution attacking a discriminatory plan is brought under state or federal law involves little more than a choice of forum. The chance that the choice of a state forum over a federal one would impede the goals of ERISA is negligible in such instances. Furthermore, we note that Congress' concern that a body of umiform common law relating to employee benefit plans be developed did not prevent it from conferring concurrent jurisdiction on state and federal courts over disputes involving the interpretation of the terms contained in employee benefit plans. *See* 29 U.S.C. § 1132(e)(1).

*co., supra,* 415 U.S. at 48, 94 S.Ct. at 1019 [19] and discrimination in employee benefit plans to be "among the most serious forms of employment discrimination," chose, by enacting section 1144, to limit both the forums in which victims of such discrimination could secure relief and the resources available to fight such discrimination, and to jeopardize the prompt and efficient settlement of claims arising from an employer's discriminatory conduct, even though no purposes of ERISA would be furthered thereby.[20]

**19.** *See also Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

**20.** We also reject Westinghouse's argument that because legislative history indicates Congress' belief that ERISA preempted state age discrimination laws, even though the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (1975), contains a savings provision similar to 42 U.S.C. § 2000e–7, Congress also believed that ERISA preempted state sex discrimination laws. Federal courts have recognized that "[t]he Age Act may profitably be compared with Title VII of the Civil Rights Act of 1964 in terms of its purpose and prohibitions . . . , and thus, 'analogies to Title VII are often helpful in age discrimination cases.' . . . However, the two statutes are not entirely identical and the decisions under Title VII are not wholly dispositive of all issues raised in an action brought under the Age Act." *Murphy v. American Motors Sales Corp.,* 410 F.Supp. 1403, 1405 (N.D.Ga.1976), *modified* 570 F.2d 1226 (5th Cir. 1978). *See also Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 765, 99 S.Ct. 2066, 2076, 60 L.Ed.2d 609 (1979) (BLACKMUN, J., concurring). This recognition that differences exist between the ADEA and Title VII is no more than recognition that discrimination against aged employees presents unique problems that Congress chose to address by a separate act rather than by Title VII.

We find the comments Senators Williams and Javits made in connection with the 1978 amendments to the ADEA (*see* footnote 15 *supra* ), unhelpful to a resolution of the issues here presented. Those comments were intended to allay congressional fears that by increasing the age limit of the ADEA's protection against age discrimination Congress would force employers to incur unreasonable costs in the maintenance of their employee welfare and pension benefit plans. Thus, the ADEA amendments, while increasing the protections of the Act, also allow employers to treat aged employees differently from younger employees with respect to plan benefits. If state laws relating to age discrimination in employee benefit plans had not been preempted by ERISA, the Congressional policy of prohibiting discrimination against aged employees while at the same time limiting financial costs incurred by employers on account of this policy might have been jeopardized.

Furthermore, the comments of Senators Williams and Javits were supported by the legislative history of ERISA. State regulation of

The decision in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), does not assist Westinghouse. Indeed to the contrary. It may be granted that under *Gilbert* a state law requiring that employers offer maternity benefits to their employees on the same terms as benefits are offered for other temporary disabilities would require more than required by Title VII before enactment of the Pregnancy Discrimination Act, P.L. 95–555, 92 Stat. 2076 (approved Oct. 31, 1978). However, it is unnecessary for us to decide whether Congress by enacting section 1144 intended to preempt state sex discrimination laws that go beyond the requirements of Title VII. In *Gilbert*, six justices of the United States Supreme Court, rejecting the decisions of six federal circuit courts of appeals and the EEOC's interpretative guidelines, held that Title VII did not require employers to treat maternity as a disability in employee disability plans. In response, Congress enacted the Pregnancy Discrimination Act, legislatively overruling *Gilbert*. The Senate and House reports in support of the Act leave no doubt that Congress believed that Title VII as enacted already prohibited such discrimination, and that the Pregnancy Discrimination Act was necessary only to correct the decision in *Gilbert*. *See* Senate Report No. 95–331 and House Report No. 95–948 (1978), U.S.Code Cong. & Admin. News 1978, p. 4749.[21] The reports further indicate that

employee benefit plans through age discrimination laws would have inevitably constituted dual regulation on matters explicitly covered by ERISA. *See e. g.*, 29 U.S.C. § 1054 (1975) (establishing benefit accrual requirements). The legislative history of ERISA, as noted previously, clearly shows that section 1144 was enacted to eliminate even "the threat of conflicting and inconsistent State and local regulation." 120 Cong.Rec. 29197 (1974) (comments of Representative Dent). None of the provisions in ERISA addresses, directly or indirectly, sex discrimination in employee benefit plans.

21. The House Report stated:
 Congress enacted title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, to prohibit discrimination in employment on the basis of race, color, religion, sex or national origin.
 H.R. 6075 will amend Title VII to clarify Congress' intent to include discrimination based on pregnancy, childbirth or related

Congress believed that state laws prohibiting discrimination against maternity benefits in employee welfare benefit plans survived the enactment of ERISA.[22]

> medical conditions in the prohibition against sex discrimination in employment.
>
> The Equal Employment Opportunity Commission, charged with implementation of Title VII, interpreted the act to include discrimination based on pregnancy. The EEOC guidelines, as amended in March 1972, state that excluding applicants or employees from employment because of pregnancy or related medical conditions is a violation of Title VII. Specifically, these guidelines require employers to treat disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefrom as all other temporary disabilities. (See 29 C.F.R. Sec. 1604.10.) It is the Committee's view that these guidelines rightly implemented the Title VII prohibition of sex discrimination in the 1964 act.
>
> Eighteen Federal district courts and all seven Federal courts of appeals which have considered the issue have rendered decisions prohibiting discrimination in employment based on pregnancy, in accord with the Federal guidelines.
>
> Contrary to these rulings and guidelines, the Supreme Court, in *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed. 343 (1976)[1], decided in favor of General Electric's disability insurance plan, which excluded coverage for women with pregnancy–related disabilities. The Court concluded that this exclusion in the company's benefits policy was not gender–related but condition–related. It went on to indicate that because the plan did not exclude any disability that could be incurred by both men and women, it was not discriminatory.
>
> Justice Brennan, in a dissenting opinion, supported the EEOC guidelines as a reasonable interpretation and implementation of the broad social objectives of Title VII. He pointed out that since the plan included comprehensive coverage for males, and failed to provide comprehensive coverage for females, the majority erred in finding that the exclusion of pregnancy disability coverage was a nondiscriminatory policy. Furthermore, Justice Stevens, in his dissenting opinion, argued that "it is the capacity to become pregnant which primarily differentiates the female from the male."
>
> It is the committee's view that the dissenting Justices correctly interpreted the Act.
>
> * * * * * *
>
> H.R. 6075 was introduced to change the definition of sex discrimination in Title VII to reflect the commonsense view and to ensure that working women are protected against all forms of employment discrimination based on sex.
>
> [1978] U.S.Code Congressional and Administrative News, pp. 4750–51.

22. Both reports cite in support of the passage of the Pregnancy Discrimination Act the fact that the costs of a federal requirement mandating nondiscriminatory coverage of maternity–related disabili-

This history confirms the conclusion that Congress never intended to insulate employee benefit plans from the protections of state sex discrimination laws requiring the provision of maternity benefits on equal terms as benefits for other temporary disabilities. It shows that what a majority of the Supreme Court in *Gilbert* said Title VII required differed from what Congress believed (and had reason to believe) it required. Because our task here is to divine Congressional intent, and because the maintenance of Lukus's suit under the PHRA is consistent with that intent, as we perceive it to be, we hold that her suit is not barred by the preemptive language in section 1144 of ERISA.[23]

## II.

Westinghouse's second preliminary objection is that "PHRA, by its own terms, does not apply to Westinghouse's plan." This objection is based upon 43 P.S. § 955(a) (Supp. 1979–80), which provides:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . .

ties would be minimized since twenty–five states currently interpreted their own fair employment laws to prohibit such discrimination.

**23.** We also note that our holding accords with the weight of precedent from other jurisdictions. *See Bucyrus–Erie Co. v. Dept. of Industry, Labor & Human Relations,* 599 F.2d 205 (7 Cir. 1979); *Brown Co. v. Dept. of Industry, Labor & Human Relations,* 476 F.Supp. 209 (W.D.Wis.1979); *Minnesota Mining & Mfg. Co. v. State,* Minn., 289 N.W.2d 396 (1979); *Franklin Manufacturing Co. v. Iowa Civil Rights Comm.,* Iowa, 270 N.W.2d 829 (1978); *Gast v. State,* 36 Or.App. 441, 585 P.2d 12 (1978); *Illinois Bell Telephone Co. v. Fair Employment Practices Comm.,* 68 Ill.App.3d 829, 25 Ill.Dec. 328, 386 N.E.2d 599 (1st Dist. 1979); *Liberty Mutual Insurance Co. v. State Div. of Human Rights,* 402 N.Y.S.2d 218, 61 A.D.2d 822 (1978); *Westinghouse Electric Corp. v. State Human Rights Appeal Bd.,* 401 N.Y.S.2d 597, 60 A.D.2d 943 (1978), *cert. denied,* 439 U.S. 1073, 99 S.Ct. 845, 59 L.Ed.2d 39 (1979); *Goodyear Tire & Rubber Co. v. Dept. of Industry, Labor and Human Relations,* 87 Wis.2d 56, 273 N.W.2d 786 (4th Dist. 1978); *Time Insurance Co. v. Dept. of Industry, Labor and Human Relations,* 46 L.W. 2369 (Wisc.Cir.Ct., Dane Cty., filed 1/3/78). *But see Pervel Industries, Inc. v. Connecticut Commission on Human Rights & Opportunities,* 468 F.Supp. 490 (D.Conn. 1978), *aff'd,* 603 F.2d 214 (2d Cir. 1979).

(a) For any employer because of the . . . sex . . of any individual to refuse to hire or employ, or to bar or to discharge from employment such individual, or to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment, if the individual is the best able and most competent to perform the services required. The provision of this paragraph shall not apply, to (1) termination of employment because of the terms or conditions of any bona fide retirement or pension plan, (2) operation of the terms or conditions of any bona fide retirement or pension plan which have the effect of a minimum service requirement, (3) operation of the terms or conditions of any bona fide group or employe insurance plan.

Westinghouse argues: that any group or employee insurance plan that pays benefits to employees is a "bona fide" plan; that as its plan pays benefits, it is a "bona fide" plan; that the provisions of the PHRA prohibiting sex discrimination "shall not apply, to . . . operation of the terms or conditions of any bona fide group or employe insurance plan," § 955(a)(3); and that therefore Lukus's action must be dismissed.[24]

It will be observed that Westinghouse's argument depends upon the assumption, or conclusion, that Lukus's action represents a challenge to the "operation of the terms or conditions" of Westinghouse's plan. Lukus, however, does not so describe her action; instead, she alleges, *inter alia,* that Westinghouse has violated section 955(a). Complaint, para. 14, Record at 5a. According to Westinghouse, this

---

**24.** In *Anderson v. Upper Bucks County Area V. T. School,* 30 Pa. Cmwlth. 103, 373 A.2d 126 (1977), the Commonwealth Court acknowledged, without deciding the issue Westinghouse raises here. The court held that "a disability plan which expressly denies benefits for disability arising out of pregnancy is one which discriminates against women employes because of their sex," *Id.,* 30 Pa.Cmwlth. at 110, 373 A.2d at 130, and thus violates section 955(a). However, the court did not find it necessary to construe the exemption in section 955(a)(3), since only the employer's sick leave policy, which was funded entirely by the employer, was in issue, and not the terms and conditions of the employer's group insurance policy for its employees. *Id.,* 30 Pa.Cmwlth., at 114, 373 A.2d at 132.

difference in description is immaterial; in its view, Lukus's action "falls squarely within the statutory exception [of section 955(a)(3)]." Brief for Appellant at 12. We therefore find ourselves presented with a straightforward problem of statutory construction. The first sentence of section 955(a) prohibits an employer from "discriminat[ing] against [an employee] with respect to compensation, hire, tenure, terms, conditions or privileges of employment." No doubt, this broad prohibition is to *some extent* entrenched upon by the exemption provided in section 955(a)(3). The question is, To *what* extent? Specifically: Is the prohibition, in the first sentence of section 955(a), against "discrimination," *entirely* undone by the exemption, in section 955(a)(3), of the "operation of the terms and conditions of any bona fide" plan? Or is it only *partly* undone? Westinghouse argues that the prohibition is entirely undone, so that any bona fide plan is exempt from regulation under the PHRA, even if the plan discriminates.

In considering this argument, we may start by recognizing the Legislature's explicit intent that the PHRA should eradicate sexual bias and prejudice in all aspects of the employer–employee relationship. 43 P.S. § 952(b) states that the policy of the PHRA is "to foster the employment of all individuals in accordance with their fullest capacities regardless of their . . . sex . . . and to safeguard their right to obtain and hold employment without such discrimination . . .." To accomplish these purposes, the provisions of the PHRA "shall be construed liberally." 43 P.S. § 962(a).

So instructed, we may turn to the construction of the first sentence of section 955(a), which, as just noted, forbids employers from discriminating on the basis of sex "with respect to compensation, hire, tenure, terms, conditions or privileges of employment."[25] There can be no

25. Discrimination on the basis of occupational qualification is not forbidden, but it is established that this exception is very narrow, and that the burden is on the employer to show that it applies to the discriminatory conduct in question. *See, e. g., Leechburg Area*

question that the benefits offered by Westinghouse under its disability plan constitute "compensation" within the meaning of this provision. *Compare Los Angeles Dept. of Water & Power v. Manhart,* 435 U.S. 702, 712 n. 23, 98 S.Ct. 1370, 1377 n. 23, 55 L.Ed.2d 657 (1978) (plurality opinion) (employee pension benefits are compensation under the Equal Employment Opportunity Act). Those benefits have an ascertainable monetary value for employers and employees, *see generally West Middlesex Area School Dist. v. Commonwealth, Human Relations Comm.,* 39 Pa.Cmwlth. 58, 394 A.2d 1301 (1978), and are frequently the result of vigorous bargaining.[26] Thus, if Westinghouse offered fewer disability benefits to Lukus because of her sex than it offered to other employees, it engaged in discriminatory conduct that was no different than if it had offered Lukus a lower wage because of her sex.

It is now in order to consider whether, as Westinghouse argues, section 955(a)(3) entirely exempts Westinghouse from engaging in such discriminatory conduct. As we do so, it will become apparent that the critical fact is that in expressing the prohibition against discrimination in the first sentence of section 955(a), the Legislature chose markedly different language than it did in expressing the exemption in section 955(a)(3). If the exemption in section 955(a)(3) included any reference to "discrimination," there might indeed be some substance to Westinghouse's argument. However, there is no such reference. The only reference is to the "operation of the terms or conditions" of a bona fide plan.

■ It is a well–established rule of construction that the Legislature is presumed not to have intended provisions in its laws as mere surplusage. *Masland v. Bachman,* 473 Pa. 280, 291, 374 A.2d 517, 522 (1977). Courts must therefore construe a statute, if possible, so as to give effect to every

*School Dist. v. Commonwealth, Human Relations Comm.,* 19 Pa. Cmwlth. 614, 339 A.2d 850 (1975).

**26.** Indeed, the plan involved in this suit resulted from collective bargaining between Westinghouse and Lukus's union representatives. *See* footnote 2 *supra.*

word, sentence, or provision of the statute. *Daly v. Hemphill*, 411 Pa. 263, 273, 191 A.2d 835, 842 (1963). *See also Whitemarsh Twp. Authority v. Elwert*, 413 Pa. 329, 196 A.2d 843 (1964); *City of Wilkes–Barre v. Ebert*, 22 Pa.Cmwlth. 356, 349 A.2d 520 (1975); 1 Pa.C.S.A. § 1921(a) (Supp.1964–78). If we were to accept Westinghouse's argument that the reference in section 955(a)(3) to the "operation" of a plan includes "discrimination," we should at least have come close to reducing the first sentence of section 955(a), prohibiting discrimination, to mere surplusage.

 A second well–established rule of construction is that in construing a statute, courts must construe the statute's "[w]ords and phrases . . . according to rules of grammar and according to their common and approved usage . . . ." 1 Pa.C.S.A. § 1903(a) (Supp.1964–78). The word "operation," according to its common and approved usage, is a synonym of "functioning" or "working." *See* Webster's Third New International Dictionary of the English Language Unabridged (1965). This suggests that the exemption in section 955(a)(3) of the *operation* (*i. e.*, functioning) of the terms or conditions of an employee insurance plan was not intended by the Legislature to include exemption of the *formation*, or *establishment*, of the plan. This suggestion quickly becomes persuasive as one considers the reasons that might have convinced the Legislature to distinguish between the establishment of an employee insurance plan by an employer (as an act *not* to be exempted from the prohibitions of section 955(a)) and the operation of the terms and conditions of the plan once it has been established (as an act, at least so far as the employer is concerned, *to* be exempted).

Section 955(a) focuses exclusively on an employer's relationship with its employees, or potential employees.[27] The provision's sole purpose is to outlaw sex discrimination in employment by compelling employers to respect the principle of sexual equality by offering employment to all individ-

27. Section 955(a) states: "It shall be . . . unlawful . . . [f]or any *employer* . . . [to discriminate] . . . " (Emphasis added.)

uals on equal terms. An employer can violate the principle of sexual equality in employment with equal facility and with equally injurious consequences by establishing a sexually discriminatory disability plan as it can by discriminating with respect to other forms of compensation. Furthermore, an employer's act of establishing a discriminatory insurance plan is not different in nature or quality from other kinds of discriminatory acts; a prosecution of the employer under section 955(a) for creating a discriminatory insurance plan will be essentially similar to prosecutions arising out of other acts of discrimination.

When one asks whether the operation of the terms or conditions of an employee insurance plan, as distinguished from the establishment of the plan, is discriminatory, the nature of the inquiry changes considerably. One leaves the area of employment discrimination and enters the area of insurance regulation. Normally the terms and conditions found in an employee insurance plan will originate from two sources: the employer (or possibly the employer and employees together in instances where the employees have the power to demand that specific benefits be provided by the plan), and the insurance company that provides the insurance policies for the plan.[28] Although the employer will have some choice as to the kind of policy it purchases, it will have no control over most aspects of the insurance company's underwriting and rate–making practices.[29] Because those practices are inevitably based upon the principle of pooling insurance risks to allow the better risks to subsidize

**28.** In the present case, the record indicates that Westinghouse's disability plan was underwritten by the Metropolitan Life Insurance Company, in cooperation with the Equitable Life Assurance Society of the United States and the Travelers Insurance Company. Record at 34a.

**29.** *See* R. Keeton, Basic Text on Insurance Law § 2.10(b)(7) at 72–73 (1971): "Only in unusual circumstances are insurance contracts negotiated without primary reliance upon an assumption that the insurer offers only a limited range of forms of insurance, and the purchaser must accept one of these if he desires insurance with the company. It is for this reason that insurance is referred to as a contract of adhesion." (Footnote omitted.) *See also Brakeman v. Potomac Insurance Co.,* 472 Pa. 66, 371 A.2d 193 (1977).

the poorer risks,[30] the insurance company may be vulnerable to charges of discriminatory policy–making.[31] However, the evidence needed to prove that the insurance company has engaged in discriminatory conduct, rather than in legitimate insurance practice, will almost always be beyond the reach of average persons, for statisticians and actuaries will be needed to assemble and interpret the crucial facts.[32]

**30.** *See generally Los Angeles Dept. of Water & Power v. Manhart, supra,* 435 U.S. at 710, 98 S.Ct. at 1376 (plurality opinion):

[W]hen insurance risks are grouped, the better risks always subsidize the poorer risks. Healthy persons subsidize medical benefits for the less healthy; unmarried workers subsidize the pensions of married workers; persons who eat, drink, or smoke to excess may subsidize pension benefits for persons whose habits are more temperate. Treating different classes of risks as though they were the same for purposes of group insurance is a common practice which has never been considered inherently unfair. (Footnote omitted.)

*See also* R. Keeton, *supra* § 2.8(a).

**31.** As one commentator puts it, "Rating practices are a matter of continuing concern and occasionally violent controversy." R. Keeton, *supra* § 8.3 at 556. *See also Stern v. Massachusetts Indemnity & Life Insurance Co.,* 365 F.Supp. 433 (E.D.Pa.1973); *Physicians Mutual Ins. Co. v. Denenberg,* 15 Pa.Cmwlth. 509, 327 A.2d 415 (1974).

**32.** Indeed, Westinghouse recognizes as much. Thus it has submitted that

there are, in fact, race and sex–based differences in matters such as life expectancy, benefit pay–outs, and susceptibility to illness and disease [that could legitimize race and sex–based distinctions in employee disability plans]. In the absence of a broad–based exemption such as that in § 5(a)(3), the legislature would be opening all of these differences to challenge under the PHRA. Instead, it is reasonable to assume that the Pennsylvania legislature chose not to attempt to foresee and resolve all of the complex problems and differentials which might arise in the operation of disability plans. Thus, the legislature decided in 1956 to exempt these plans from any challenge under the PHRA.

Reply Brief for Appellant at 6.

*See also* R. Keeton, *supra* § 8.4(b) at 565:

Rate regulatory standards customarily include a requirement that rates not be "unfairly discriminatory."

The generality of this standard leaves wide leeway for evaluative determinations regarding the number and nature of categories employed in a rating system. The difficulties of applying such a standard have figured in an assessment that no other objective of insurance regulation is as difficult to achieve as equitable rating. [Footnotes omitted.]

At the time the PHRA was enacted, insurance laws were already in effect prohibiting unfair discrimination by insurers in connection with any policy of life, health, or accident insurance. *See, e. g.*, the Act of May 17, 1921, P.L. 682, arts. III & VI, §§ 353, 626, *as amended*, 40 P.S. §§ 477a, 761.[33] Given these pre–existing laws, and the complexity of the subject matter, it would have been reasonable for the Legislature to desire to avoid overlapping, and possibly conflicting regulation of an employee insurance plan by the Human Relations Commission, an agency with no expertise in insurance, and the Insurance Commissioner.

We therefore conclude that section 955(a)(3) was enacted as a jurisdictional device separating the regulatory realms of the PHRC and the Insurance Commissioner. The situation may be profitably compared with the jurisdictional division that exists between the PHRC and the Public Utility Commission with respect to the regulation of discriminatory practices by power companies. While a power company's employment practices fall within the PHRC's jurisdiction, the company's service and rate–making practices fall within the exclusive jurisdiction of the PUC. *Philadelphia Electric Company v. Human Relations Comm.*, 5 Pa.Cmwlth. 329, 290 A.2d 699 (1972); *NAACP v. Public Utility Comm.*, 5 Pa. Cmwlth. 312, 290 A.2d 704 (1972). Similarly, section 955(a)(3) ensures that discriminatory practices by insurance companies will be regulated by the agency with broad oversight of the insurance industry, and that employers will not be held responsible for those practices under the PHRA, which governs relations between employers and employees, not between employers and third parties. *Compare Los Angeles Dept. of Water & Power v. Manhart, supra*, 435 U.S. at 718 n. 33, 98 S.Ct. at 1380 n. 33 (construing the Equal

Professor Keeton describes at greater length the problems confronting regulators in determining the equitableness of insurance rates in § 8.4(a) of his treatise.

**33.** Since the passage of the PHRA, the Legislature has enacted the Unfair Insurance Practices Act of 1974, Act of July 22, 1974, P.L. 589, No. 205, 40 P.S. §§ 1171.1 *et seq.* (Supp.1979–80), a comprehensive act regulating discriminatory practices in the insurance industry.

Employment Opportunity Act as primarily governing "relations between employees and their employer, not between employees and third parties"). Nothing in section 955(a)(3) suggests that by enacting it the Legislature intended to relieve an employer of legal responsibility for employment decisions that restrict the availability of insurance benefits on equal terms to all its employees.

■ In the present case, Lukus charges that Westinghouse has discriminated against her and other female employees by establishing a disability insurance plan that provides for weekly payments for all disabling non–occupational sicknesses and accidents, except for pregnancy–related disabilities. This charge has nothing to do with the underwriting or rate–making practices of insurance companies, or the operation of the terms or conditions of the plan. Rather, it concerns only Westinghouse's decision to compensate its employees for all disabilities but pregnancy, a decision that is not qualitatively different from other decisions Westinghouse makes regarding other forms of employment compensation. Lukus, therefore, has stated a claim cognizable under the PHRA.[34]

**34.** We note that our holding conforms with PHRC regulations that interpret the PHRA to apply to an employer's practices and policies regarding employee disability insurance plans. *See* 16 Pa.Code § 41.103(a) (1979):

*Temporary disability due to pregnancy or childbirth.*

Written and unwritten employment practices and policies regarding job benefits and job security, including, but not limited to, commencement and duration of leave, the availability of extensions, the accrual of seniority and other benefits and privileges, reinstatement and payment under any health or temporary disability insurance or sick leave plan, formal or informal, shall be applied to disability due to pregnancy or childbirth on the same terms and conditions as they are applied to other temporary disabilities.

43 P.S. § 957(d) confers on the PHRC the power "[t]o adopt, promulgate, amend and rescind rules and regulations to effectuate the policies and provisions of [the] act." While it is true that an administrative agency cannot "invest itself with authority or powers not fairly or properly within the legislative grant," *Federal Deposit Ins. Corp. v. Bd. of Finance and Revenue*, 368 Pa. 463, 472, 84 A.2d 495, 499 (1951), "[w]hen the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering . . . administrative interpretations of such statute." 1 Pa.C.S.A.

## III.

It will be convenient to skip Westinghouse's third preliminary objection for the moment. Westinghouse's fourth preliminary objection is that "Lukus is barred by § 962(b) of PHRA from maintaining her action because she previously filed a complaint in federal court based upon the same grievance."

Section 962(b) provides:

b) Except as provided in subsection (c), nothing contained in this act shall be deemed to repeal or supersede any of the provisions of any existing or hereafter adopted municipal ordinance, municipal charter or of any law of this Commonwealth relating to discrimination because of race, color, religious creed, ancestry, age, sex, national origin or handicap or disability, but as to acts declared unlawful by section five of this act [section 955] the procedure herein provided shall, when invoked, be exclusive and the final determination therein shall exclude any other action, civil or criminal, based on the same grievance of the complainant concerned. If such complainant institutes any action based on such grievance without resorting to the procedure provided in this act, he may not subsequently resort to the procedure herein. In the event of a conflict between the interpretation of a provision of

§ 1921(c)(8) (Supp.1964–78). *See also Hotel Casey Co. v. Ross,* 343 Pa. 573, 584, 23 A.2d, 737, 742 (1942) (interpretation of administrative body is persuasive upon the courts).

Additionally, we note that our decision harmonizes with the Commonwealth Court's decisions in *Canon–McMillan School Dist. v. Commonwealth, Human Relations Comm.,* 30 Pa.Cmwlth. 1, 372 A.2d 498 (1977), and *West Middlesex Area School Dist. v. Commonwealth, Human Relations Comm., supra.* In *Canon–McMillan,* the Commonwealth Court held that an employer violates section 955(a) when its practices, though fair in form and applied without wrongful intent, have the effect of misleading its female employees to believe that its employee insurance plan offers fewer benefits than it actually does, thereby denying those employees access to the plan's benefits equal to that enjoyed by their male counterparts. In *West Middlesex Area School Dist.,* the Commonwealth Court held that an employer who engages in sexually discriminatory conduct by refusing to allow an employee to return to work after a maternity leave is liable for the employee's loss of medical and hospitalization insurance premiums.

this act and the interpretation of a similar provision contained in any municipal ordinance, the interpretation of the provision in this act shall apply to such municipal ordinance.

This provision makes clear that the Legislature was concerned with the relationship between the PHRA and any other "municipal ordinance, municipal charter or . . . law of this Commonwealth relating to discrimination;" nowhere does the Legislature address the relationship between the PHRA and federal discrimination laws. If the Legislature wished to limit the relief available under the PHRA to instances where the aggrieved individual had not sought federal remedies, we should have expected the Legislature to say so, especially since it has directed that the word "action" (which is used in the second sentence of section 962(b)) shall normally be interpreted as "[a]ny suit or proceeding in any court of this Commonwealth," *i. e.*, not "in any court of the United States." 1 Pa.C.S.A. § 1991 (Supp. 1964–78).

Because the present action is Lukus's first action under the laws of this Commonwealth based upon Westinghouse's maternity benefit policy, it is not barred by section 962(b).

## IV.

Westinghouse's third preliminary objection, and the last to be considered,[35] is that "Lukus has failed to exhaust her administrative remedies under PHRA."

The administrative remedies thus referred to are set forth in 43 P.S. § 959 (Supp.1979–80) of the PHRA, which provides that

[a]ny individual claiming to be aggrieved by an alleged unlawful discriminatory practice may make, sign and file with the [Pennsylvania Human Relations] Commission a verified complaint, in writing, which shall state the name and address of the . . . employer . . . alleged to have committed the unlawful discriminatory practice

---

**35.** *See* note 3, *supra.*

complained of, and which shall set forth the particulars thereof and contain such other information as may be required by the Commission.

This section further provides that upon the filing of a complaint, the PHRC shall make a prompt investigation, and if probable cause exists, endeavor immediately to eliminate the unlawful discriminatory practice by conference, conciliation, and persuasion. If these efforts fail, the PHRC is empowered to hold hearings on the complaint, make findings of fact, and order appropriate relief. *Id.* The order may be appealed to the Commonwealth Court under the Administrative Agency Law, Act of April 28, 1978, P.L. 202, No. 53, 2 Pa.C.S.A. §§ 101 et seq., and is judicially enforceable. 43 P.S. § 960 (Supp.1979–80).

43 P.S. § 962(c) (Supp.1979–80) of the PHRA provides:

In cases involving a claim of discrimination, if a complainant invokes the procedures set forth in this act, that individual's right of action in the courts of the Commonwealth shall not be foreclosed. If within one (1) year after the filing of a complaint with the Commission, the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant. On receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act.

Westinghouse argues that Lukus's action is barred because:

Lukus "never actually filed a complaint with the PHRC," as required by section 959, Brief for Appellant at 68; she denied the PHRC "the opportunity to investigate and conciliate" her complaint, as required by section 959, *id.*; and she has not received "a 'right to sue' notice from the PHRC," as required by section 962(c), *id.* It will be convenient to consider these arguments in a slightly different order than Westinghouse states them.

A

We may first consider Westinghouse's argument that Lukus "never actually filed a complaint with the PHRC." [36]

On March 5, 1976, Lukus filed a verified complaint with the United States Equal Employment Opportunity Commission, alleging that Westinghouse had discriminated against her on the basis of sex by denying her disability benefits for her pregnancy. On March 11, 1976, the EEOC transmitted the complaint to the PHRC pursuant to 42 U.S.C. § 2000e–5(c) (1974), which provides:

> In the case of an alleged unlawful employment practice occurring in a State . . . which has a . . . law prohibiting the unlawful employment practice alleged and establishing or authorizing a State . . . authority to grant or seek relief from such practice . . . upon receiving notice thereof, no charge may be filed [with the EEOC] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State . . . law, unless such proceedings have been earlier terminated . . . . .

In its letter transmitting Lukus's complaint to the PHRC the EEOC requested the PHRC to "terminate [its] proceedings [on the complaint] early and return jurisdiction to this Commission." Lukus also wrote a letter to the PHRC, requesting that it "immediately terminate the processing of my charge . . . as I prefer the Equal Employment Opportunity Commission to pursue the matter." On March 11, 1976 (the same day the EEOC wrote to the PHRC), the PHRC wrote to the EEOC, saying that it was terminating its activity as requested so that the EEOC could "immediately assume jurisdiction over the Charge(s)." Thereafter, the PHRC apparently refrained from taking further action on Lukus's complaint. The complaint was processed by the EEOC, and on May 7, 1976, the EEOC determined that Westinghouse had violated Lukus's right under the Equal Employment Opportunity Act. On November 8, 1976, Lukus

36. The facts related below are taken from the record and Westinghouse's Statement of the Case in its brief.

filed suit against Westinghouse in the United States District Court for the Western District of Pennsylvania. *See Lukus v. Westinghouse Electric Corp.*, C.A. 76–1409 (W.D.Pa.). On September 28, 1977, this suit was dismissed. (The United States Supreme Court had by then filed its decision in *General Electric Co. v. Gilbert, supra. See* discussion at pages 444–445, *supra.*) Anticipating this dismissal, or so we may assume, on June 30, 1977, Lukus filed the present action in the Court of Common Pleas of Allegheny County.

Westinghouse assumes, and we agree, that this procedural history establishes that Lukus has "invoke[d] the procedures set forth in [the PHRA]," section 962(c), so as to make those procedures here exclusive state remedy for Westinghouse's alleged discrimination. The complaint she filed in the lower court states explicitly that her "action arises under the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951–962.2, providing for relief against discrimination in employment." We do not agree with Westinghouse, however, that Lukus failed to comply with the procedures set forth in the PHRA in that she never filed a complaint with the PHRC. The transmittal of Lukus's EEOC complaint to the PHRC constituted a filing of a verified compliant with the PHRC. Nothing in the PHRA required that Lukus personally file her complaint with the PHRC, and her EEOC complaint satisfied all the pleading requirements prescribed by section 959.[37] Furthermore, the PHRC treated Lukus's EEOC complaint as equally capable of invoking agency action as other kinds of verified complaints. Thus, the PHRC wrote the EEOC that it was terminating its activity on Lukus's EEOC complaint; it could not terminate activity unless it had at some point

37. While the PHRC, pursuant to its powers under the last paragraph of section 959, has promulgated regulations establishing additional pleading requirements for complaints filed before it, *see* 16 Pa.Code § 42.31 (1979), the PHRC has retained discretion to entertain complaints in non–compliance with those requirements. 16 Pa.Code § 42.11 (1979). In the present case, the PHRC chose to accept Lukus's complaint.

commenced activity on the complaint.[38] Furthermore, it would be frivolous to suppose that the PHRC was unaware of the requirement in 42 U.S.C. § 2000e–5(c), that the EEOC transmit Lukus's complaint to it, and of the effect its termination letter to the EEOC would have on the EEOC's handling of the complaint. The close relationship existing between the PHRC and the EEOC has been noted in prior cases, *see Pennsylvania Human Relations Comm. v. St. Joe Minerals Corp.*, 476 Pa. 302, 382 A.2d 731 (1978); *Commonwealth, Human Relations Comm. v. United States Steel Corp.*, 10 Pa.Cmwlth. 408, 311 A.2d 170 (1973), *aff'd*, 458 Pa. 559, 325 A.2d 910 (1974), and we may assume that the PHRC knew the jurisdictional limitations contained in 42 U.S.C. § 2000e–5(c). It was in any case explicitly reminded of them by the EEOC's transmittal letter, which stated: "The [EEOC] will automatically file this charge at the expiration of the deferral period [in 42 U.S.C. § 5000e–5(c)], unless we are notified before the expiration of that period that your agency has terminated proceedings." Thus, when the PHRC

**38.** Westinghouse contends that Lukus requested the PHRC to terminate its activity on her EEOC complaint before the PHRC ever received the complaint, and that therefore the complaint could not have been filed with the PHRC. We reject this contention for several reasons. First, the record does not show that the PHRC received Lukus's letter asking that it terminate its activity before the PHRC received the EEOC complaint. Lukus's letter is undated, so it is uncertain when the PHRC received it. Second, Westinghouse's allegation that the PHRC wrote its termination letter before it received the EEOC complaint, *see* Brief for Appellant at 57 n. 37, is in essence a charge that the PHRC, not Lukus, engaged in an improper attempt to circumvent the jurisdictional requirements in 42 U.S.C. § 2000e–5(c) by representing to the EEOC that it was terminating activity on a discrimination complaint that had not yet been filed. However, the PHRC's termination letter to the EEOC refers to the EEOC's deferral of Lukus's complaint, and thus indicates that the PHRC had indeed received the EEOC complaint before it wrote its termination letter. Third, Lukus's letter to the PHRC does not show that she wished the PHRC to refrain from filing her complaint. To the contrary, the letter, when read in light of the requirements of 42 U.S.C. § 2000e–5(c), expresses Lukus's wish that the PHRC assume jurisdiction of her EEOC complaint, but then terminate further activity so that the EEOC could proceed in the matter. When Lukus's letter is so read, it becomes immaterial when the letter was received by the PHRC, since whenever it was received, the letter was consistent with the PHRC's filing of the complaint.

wrote its termination letter to the EEOC, the PHRC must have known that its letter would be construed by the EEOC as a representation that Lukus had filed a complaint before it, and that the PHRC had terminated proceedings initiated by the complaint.

## B

We may next consider Westinghouse's argument that Lukus is not entitled to maintain her present action because she never received a "right to sue notice" from the PHRC, that is, a notice under section 962(c) that the PHRC had "dismiss[ed] [her] complaint or ha[d] not entered into a conciliation agreement."

43 P.S. § 962(c) provides that "[i]f within one (1) year after the filing of a complaint . . . the Commission dismisses the complaint or has not entered into a conciliation agreement to which the complainant is a party, the Commission must so notify the complainant." The section then goes on to provide that "[o]n receipt of such a notice the complainant shall be able to bring an action in the courts of common pleas of the Commonwealth based on the right to freedom from discrimination granted by this act." Westinghouse argues that the phrase "[o]n receipt of such a notice" creates a jurisdictional prerequisite to Lukus's right to maintain a court action. We believe, however, that the phrase "[o]n receipt of such a notice" refers only to the PHRC's duty to give a complainant notice of what action it has taken on her complaint. The words "such a notice" refer back to the preceding sentence and incorporate by reference both the Commission's duty to give notice and the requirement that the notice state either that the complaint has been dismissed or that no conciliation agreement has been entered into. The Legislature's purpose in requiring "such a notice" was not to limit (by creating a jurisdictional prerequisite) but rather to expand the rights of a victim. Thus, "[o]n receipt of such a notice," the victim has the unconditional right to seek redress in court whenever the PHRC has failed within a reasonable time, i. e., within a year, to achieve a result satisfactory to the victim.

Were we to accept Westinghouse's argument, we should impose a useless procedural formality on aggrieved individuals, with the awkward consequence of requiring an aggrieved individual to file two court actions whenever the PHRC violated its duty under Section 962(c) to give the required notice: one action in mandamus, to force the PHRC to give notice; the second action against the alleged discriminator, after the notice is obtained. *Compare with Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), and *Watson v. Limbach Co.*, 333 F.Supp. 754 (S.D. Ohio 1971) (federal courts reject interpretations of Title VII which would require compliance with procedural technicalities that would serve no substantive purpose).[39]

We may next, and finally, consider Westinghouse's argument that Lukus denied the PHRC "the opportunity to investigate and conciliate" her complaint. In Westinghouse's view, this denial occurred when Lukus asked the PHRC to terminate its activity on her EEOC complaint after that complaint was transmitted to the PHRC.[40]

**39.** Our construction also comports with the legislative history of section 962(c). *See* 1974 Pa.Legis.J. 6397 (remarks of Rep. Hepford): "The language of this bill [enacting section 962(c)] clearly spells out that unless the commission dismisses the complaint or has not entered into an agreement with the complainant within 180 days [this period was subsequently changed to one year], the complainant can then proceed anew in the court of common pleas."

**40.** Much of the difficulty we have encountered in considering this argument may be attributed to the fact that the PHRC's act of "terminating activity" on Lukus's complaint was apparently not anticipated by the Legislature when it enacted the PHRA. Section 959 of the Act "mandates that *every* complaint, regardless of source, must be investigated, if thought to be valid, must be the subject of an attempt by the PHRC to conciliate the dispute, and, if conciliation fails, must be the subject of public hearings and formal findings and orders by the Commission." *Commonwealth Human Relations Comm. v. Freeport Area School Dist.*, 467 Pa. 522, 528, 359 A.2d 724, 727 (1976) (emphasis added). The only complaints not processed by the PHRC will be complaints that are withdrawn after being filed. 43 P.S. § 959 (last sentence). For the reasons stated in footnote 38 *supra*, we believe that Lukus did not withdraw her complaint when she asked the PHRC to terminate activity on it. However, we also believe that given Lukus's request, the PHRC was not remiss in the performance of its statutory responsibilities when it declined to

We have already said[41] that we believe Lukus "invoked[d] the procedures set forth in [the PHRA]" as that phrase is used in section 962(c). The lower court seems to have been of the opinion that that invocation was complete upon the filing of the complaint, and that more than one year having elapsed without the complaint being dismissed or a conciliation agreement being entered into, Lukus was free to bring her present action. *See* Slip op. of lower court, at 11. However, in our opinion, invocation of the procedures set forth in the PHRA entails more than the filing of a complaint; it includes the good faith use of the procedures provided for disposition of the complaint. The legislative history of section 962(c) shows that the Legislature intended that the PHRC should have exclusive jurisdiction of a complaint alleging violations under the PHRA for a period of one year in order to conduct an investigation of the charges and, if possible, conciliate the matter. 1974 Pa.Legis.J. 6396–98. The reasons the Legislature chose thus to postpone a complainant's right to seek redress by an action in court are clear. The PHRC possesses a "particular expertise" in the area of unlawful discrimination not possessed by the courts. *Commonwealth, Human Relations Comm. v. Feeser*, 469 Pa. 173, 179, 364 A.2d 1324, 1327 n.10 (1976), *quoting Pennsylvania Human Relations Comm. v. Alto–Reste Cemetery Ass'n*, 453 Pa. 124, 133–34, 306 A.2d 881, 887 (1973). By requiring a complainant first to repair to the PHRC, the Legislature ensured maximum use of the PHRC's expertise, thereby minimizing the inefficient use of judicial resources (and its attendant expense and embarrass-

investigate Lukus's complaint. (Nor was the PHRC obliged, as Lukus claims it was, to inform her that she might be prejudicing her rights under the PHRA by requesting it to terminate activity on her complaint.) In short, the PHRC's actions appear to us to have been reasonable when viewed in light of Lukus's request, the jurisdictional requirements of Title VII, and the PHRC's deferral arrangements with the EEOC. The Legislature's failure to anticipate the PHRC's actions is not, however, surprising. The effect of future federal legislation (Title VII) on the day–to–day operation of the PHRC could not have been foreseen by the Legislature in 1955, when it enacted the PHRA.

**41.** *See* discussion pp. 453–454, *supra*.

ment of the parties). In other words, the rationale of the principle of exhaustion of administrative remedies, applicable to other areas of administrative law, is also applicable to actions brought under section 962(c) of the PHRA. That rationale has been stated as follows:

> When the Legislature has seen fit to enact a pervasive regulatory scheme and to establish a governmental agency possessing expertise and broad regulatory and remedial powers to administer that statutory scheme, a court should be reluctant to interfere in those matters and disputes which were intended by the Legislature to be considered, at least initially, by the administrative agency. Full utilization of the expertise derived from the development of various administrative bodies would be frustrated by indiscriminate judicial intrusions into matters within the various agencies' respective domains.

> *Feingold v. Bell of Pennsylvania*, 477 Pa. 1, 6, 383 A.2d 791, 793 (1977) (footnote omitted).

Lukus argues that she was not obliged to make use of the PHRC's expertise because, in her view, to do so would have been futile. Thus, in her answer to Westinghouse's preliminary objections, Lukus alleged the "her invocation of any additional administrative steps would have been futile since Westinghouse has consistently contended that its conduct . . . conforms to applicable law." Record at 75a.

▉ The record and Westinghouse's representations to this court give credence to Lukus's claim. In its petition for Permission to Appeal from an Interlocutory Order, Westinghouse stated that it successfully opposed Lukus's federal action, which was based on the same grievance as the one presented in the present case. Record at 103a. Westinghouse also claims to have successfully opposed two other federal class actions alleging causes of action similar to the one alleged here, both of which included Lukus as a member of the putative class.[42] Brief for Appellant at 7, 55–56.

---

**42.** Westinghouse identifies these actions as *Eberts v. Westinghouse Electric Corp.*, C.A. No. 74–113 (W.D.Pa.), and *Austerman v. Westinghouse Electric Electric Corp.*, C.A. No. 75–229 (W.D.Pa.). Both of

Thus, to date, Lukus has been involved either directly or indirectly in four law suits against Westinghouse, all concerning the same grievance, all requesting similar relief, and all opposed by Westinghouse. Nevertheless, we are willing to hold, at least on the basis of the present record, that Westinghouse's actions in federal court can justify Lukus's failure to pursue her administrative remedies under the PHRA. Although Westinghouse has apparently been unamenable to settlement in proceedings before the EEOC and the federal courts, our Legislature has not indicated that it considers federal proceedings on discrimination complaints the functional equivalent of proceedings before the PHRC. See Fye v. Central Transportation, Inc., 487 Pa. 107, 409 A.2d 2 (1979).

This conclusion, however, does not end our consideration, for Lukus has also argued that if she was obliged, as we have just held she was, to make use of the PHRC's investigative and conciliation procedures, then in fact she did. In her answer to Westinghouse's preliminary objections, Lukus alleged that on or about February 17, 1972, Kathleen Eberts filed a complaint with the PHRC attacking the same practices of Westinghouse that are the subject of the present suit, and that Eberts's complaint is still pending before the PHRC. Record at 75a–76a. Lukus attached to her answer a purportedly true and correct copy of Eberts's complaint. That complaint alleged that Westinghouse denied Eberts her right to be "reinstated to her job position as plater at the East Pittsburgh Plant of Westinghouse Electric Corporation, after pregnancy because of her sex, female . . . [and] that [Westinghouse] does not grant to her and other females similarly situated the same terms, conditions or benefits of

these actions were dismissed by the federal district court. In Eberts, the Third Circuit affirmed the dismissal of the sex discrimination claim regarding the denial of maternity benefits, but reversed the dismissal of the remaining claims, which alleged other forms of sex discrimination. Eberts v. Westinghouse Electric Corp., 581 F.2d 357 (3d Cir. 1978). The Third Circuit also stated that its decision was without prejudice to the plaintiffs to seek to amend their maternity benefit claim in order to state a cognizable cause of action. Id. at 362 n. 2.

sick leave that is granted to males." Record at 78a. The complaint further alleged that Westinghouse's allegedly discriminatory practice was "of a continuing nature which has persisted up to and including the present time." Record at 80a.

These allegations raise issues of fact as to whether Eberts's complaint encompassed the kind of grievance involved in the present action, whether her complaint included Lukus as an unnamed complainant, and whether the complaint was properly filed with the PHRC and is still pending unresolved before the agency. If these questions are answered affirmatively, it would appear that Lukus has sufficiently exhausted her administrative remedies to be entitled to maintain this action.

The Supreme Court has recognized that the relief afforded by the PHRC is in the nature of class relief, and may extend to all victims of a discriminatory practice, even though the complaint attacking the practice is filed with the PHRC by only one of the victims. *Commonwealth, Human Relations Comm. v. Freeport Area School Dist.*, 467 Pa. 522, 359 A.2d 724 (1976). The only limitations on the PHRC's power to award class relief in such situations are that the complainant allege that other, unnamed, persons have been affected by the discriminatory practice (thereby giving notice to the discriminator that the requested relief extends beyond the named complainant), and that the unnamed persons entitled to relief can be described with specificity. *Id.*, 467 Pa. 530, 359 A.2d at 728.

In the present case, Westinghouse was notified by Eberts's complaint that relief was being requested for "other females similarly situated." Furthermore, it appears that on or before March 26, 1976 (the approximate date Lukus became a victim of Westinghouse's allegedly discriminatory practice), Lukus could be identified as a member of the aggrieved class in Eberts's complaint. In these circumstances, we are not simply faced with a situation where a complainant files a complaint with the PHRC, requests the

PHRC to terminate activity on the complaint, and then attempts to bring an action in court. Rather, we are faced with a situation where the complainant in a discrimination action alleges that before she brought her action in court, she had for more than a year been a party (although an unnamed one) to a PHRC complaint proceeding that has been pending now for more than seven years without an administrative resolution.

In cases where the investigatory and conciliatory powers have been invoked to eliminate, on a class–wide basis, a discriminatory practice, and the PHRC fails to enter into a conciliatory agreement within a year after an unnamed member of the class becomes aggrieved by the discriminatory practice, we believe it unnecessary for that unnamed member to file personally a complaint with the PHRC before being able to seek redress by an action in court. To impose such a requirement would be to establish a procedure that is not required by the PHRA and would serve no substantive purpose. Once the PHRC has expended its expertise in a futile attempt to conciliate the class complaint, it is unlikely that it will be able to conciliate an individual complaint based on the same grievance. Moreover, such a requirement would be a trap for the unwary. 43 P.S. § 959 requires that a complaint by an individual claiming to be aggrieved by an allegedly unlawful discriminatory practice must be filed with the PHRC within ninety days after the date of the discriminatory conduct. Yet, the victim of discrimination might reasonably conclude that she need not file a separate complaint with the PHRC if she is already included as a party in a previously filed class complaint. The Supreme Court has stated that "[t]he rule requiring exhaustion of administrative remedies is not intended to set up a procedural obstacle to recovery . . ." *Feingold v. Bell of Pennsylvania*, 477 Pa. at 10, 383 A.2d 791. Consequently, the Court's approach to the exhaustion of administrative remedies "has been, in effect, a flexible one, such as that advocated by Prof. Jaffe: 'Where the administrative process has nothing to contribute to the decision of

the issue and there are no special reasons for postponing its immediate decision, exhaustion should not be required.'" *Borough of Green Tree v. Bd. of Property Assessments*, 459 Pa. 268, 279, 328 A.2d 819, 824 (1974) (plurality opinion) (footnote omitted), *quoting* L. Jaffe, Judicial Control of Administrative Action 440 (1965). Thus, the Court has consistently held that the exhaustion of administrative remedies will not be required if the administrative remedy is pointless or inadequate. *Borough of Green Tree v. Bd. of Property Assessments, supra*, 459 Pa. at 278, 328 A.2d at 824 (plurality opinion) (collecting cases). While we have held that the exhaustion of administrative remedies is a prerequisite to an action brought under section 962(c) of the PHRA, we shall not require that those remedies be twice–exhausted, in other words, that an individual must file a separate complaint before the PHRC when that individual is already a party to a class complaint pending before the PHRC.

This established, it becomes necessary to remand this case so that the lower court may resolve the factual issues outlined above. The record does not indicate whether any evidentiary hearings have been held by the lower court; in any event, the lower court in rendering its decision made no findings of fact on these issues. We have remanded in other cases where the record was insufficient to resolve factual issues raised by preliminary objections. *See Schaffer v. Batyko*, 227 Pa.Super. 62, 323 A.2d 62 (1974); *Szekely v. Abilene Flour Mills Co.*, 211 Pa.Super. 442, 237 A.2d 242 (1967); 2 Goodrich–Amram 2d § 1028(c):3. We shall likewise remand here so that the lower court may receive evidence by depositions or otherwise pursuant to Pa.R.C.P. 1028(c), 42 Pa.C.S.A. and render a decision accordingly.

Insofar as the order of the lower court dismissed Westinghouse's first, second, and fourth preliminary objections, the order is affirmed. Insofar as the order dismissed Westinghouse's third preliminary objection, the order is vacated and the case is remanded for further proceedings consistent with this opinion.

VAN der VOORT, J., concurs in the result.