**Roger Michael AMES, et al., Appellant,**

v.

**R.E. AMES and R.G. Ames, et al., Appellees.**

No. 09–87–125 CV.

Court of Appeals of Texas, Beaumont.

Aug. 25, 1988.

Rehearing Overruled Sept. 14, 1988.

David D. Peden, Jr. and Read Koury, Richie & Greenberg, P.C., Houston, for appellant.

Arthur R. Almquist, Mehaffy, Weber, Keith & Gonsoulin, J. Hoke Peacock, Orgain, Bell & Tucker, Beaumont, for appellees.

## OPINION

BROOKSHIRE, Justice.

In the trial court R.E. Ames and R.G. Ames were plaintiffs and the Heights State Bank, now known as the NBC Bank, Houston–N.A., was a defendant. The litigation involved the claims of R.E. Ames and R.G. Ames, who were participants in the Threaded Steel Products Company employees profit sharing plan, hereafter "the plan". The litigation was also brought by the plaintiffs against Roger Michael "Mike" Ames, the trustee of the profit sharing plan, based on his failure to distribute sums of money owing to the plaintiffs under the plan, and for his wrongful conversion of those sums of money to his own uses.

The proceeding was brought against the Heights State Bank to recover certain funds of the plan that had been deposited in the bank evidenced by a certain certificate of deposit placed with the bank. The funds in the certificate of deposit originated in the profit sharing plan which belonged to the plaintiffs but were wrongfully pledged by Mike Ames as trustee as collateral for commercial loans made to the Threaded Steel Products Company.

In a juried proceeding the district court signed and rendered a judgment against Mike Ames for conversions of the sums due the plaintiffs in the sum of $212,161.40 to R.E. Ames and a separate sum of $94,501.00 to R.G. Ames. The judgment awarded an additional $10,000.00 in punitive damages for tortious conversion committed by Mike Ames. However, the court below entered judgment that R.E. Ames and R.G. Ames take nothing against the Heights State Bank. The Appellants, plaintiffs below, have properly and timely perfected their appeal from the take nothing judgment entered on their claims against the Heights State Bank, hereinafter "State Bank".

The appeal involving State Bank is based on two points of error, the first being that the district court erred in denying the Appellants' Motion for Judgment Notwithstanding the Verdict as to the State Bank because the evidence herein established as a matter of law that the funds in the certain certificate of deposit were the profit sharing trust funds that actually belonged to R.E. Ames and R.G. Ames.

The second point of error argues that the district court erred in denying the Appellants' Motion for New Trial because of the jury's negative answer to a question whereby the jury failed to find that the funds on deposit in certificate No. 28793 were profit sharing trust funds belonging to the two plaintiffs, this failing to so find being against the great weight and preponderance of the evidence.

### The General Background

R.E. "Eddy" Ames and R.G. Ames were both employees of Threaded Steel Products Company. Eddy Ames started working for the company in 1948. He began as a laborer. Threaded Steel was a family owned company. Later, Eddy joined the Air Force for four years. Afterwards he returned to Threaded Steel and remained there until 1980, serving as an employee for thirty years. He rose to Chief Executive Officer and Chairman of the Board. R.E. "Eddy" Ames possessed an ownership interest in the company, owning approximately 20% of the stock. R.E. and R.G. Ames were, as employees, members of the profit sharing plan at Threaded Steel.

Steps were taken in 1983 to terminate and wind up the profit sharing plan. The first efforts made to set up such a profit sharing plan began around 1972. R.E. "Eddy" Ames did not withdraw his share of the plan because he was not sixty years

old at the time he left Threaded Steel. After the plan was terminated he was told that Mike Ames, the plan trustee, had put the funds belonging to R.E. Ames and R.G. Ames in a certificate of deposit at the Heights State Bank in Houston.

Mike Ames, the sole trustee, never distributed or delivered any profit sharing benefits under the plan to either R.E. Ames or R.G. Ames even though he was asked for these funds on several occasions.

It is important to note that Mike Ames as trustee opened an account with the Heights Bank in November of 1982. Mike Ames told Mr. James E. Sheffield directly, who was a senior vice-president of the State bank, which Sheffield admitted, that he, Mike Ames, was the sole trustee of the profit sharing plan (also referred to as the pension plan) for Threaded Steel Products Company's employees.

At that time a check from Southwestern Life Insurance Company in the amount of $424,000 and some-odd dollars was delivered and negotiated to the Heights State Bank. This was the check that Mike Ames used to open the initial account in Heights State Bank in November of 1982. After these funds were deposited with the Bank an amount of approximately $254,000.00 was deposited in a checking account styled R.E., R.G., and R.L. Ames, with Mike Ames as the sole signatory. This $254,000.00 was part of the $424,000.00 from Southwestern Life Insurance Company. Out of this sum $156,500.00 was used to purchase a certificate of deposit in the name of Threaded Steel Products Company employees profit sharing—distribution account. An additional $13,741.00 was deposited into a checking account in the name of Threaded Steel Products Company employees profit-sharing distribution account.

The $13,741.00 was subsequently distributed to a group of employees entitled to the same. The $156,500.00 was subsequently deposited into the same account as the $13,741.00. The CD was in effect for about thirty days. It was renewed one time for another sixty days or so. The $156,500.00 was "rolled over" and put into a checking account. It was distributed to the employees.

*Background narrative of events prior to November, 1982*

In the fall of 1982 prior to the above-described transaction, Mike Ames contacted James E. Sheffield, who was then acting as a senior vice-president in the commercial loan department.

In September of 1982 a loan application was made by Mike Ames in behalf of Threaded Steel Products Company in the amount of $180,000.00. The loan was declined and never thereafter approved. The lack of approval was due to the poor financial condition of Threaded Steel Products. It should be borne in mind, as we interpret Defendant's Exhibit No. 1, that Threaded Steel Products, according to its Financial Analysis, had a loss in 1977. This loss before taxes was about $87,000; in 1978, the loss was approximately $259,000; in 1979, about $70,000; in 1980, about $441,000; and, in 1981, about $228,000. Apparently, Threaded Steel had a profit during the first six months of 1979 but not the last six months. These financial facts showing heavy losses clearly prove that any funds used by Threaded Steel Products as collateral for commercial loans necessarily came from the profit-sharing plan, inasmuch as Threaded Steel Products only five months before was denied a loan due to its poor, distressed financial condition. The State Bank knew about these horrendous losses. They totalled $1,085,000.00. These losses are up to date through 1981. Then, very shortly, in the late summer of '82, Threaded Steel Products made its application for a loan in the amount of $180,000.00 with the State Bank.

$254,646.02 of the profit-sharing funds were transferred to InterFirst Bank in Beaumont. Later, $157,895.02 was transferred by wire back to the State Bank. A CD was bought in the name of R.M. "Mike" Ames, Trustee. The CD was in the total amount of $254,000.00. This sum represented the $157,895.02 plus an additional, approximate $100,000.00, which was borrowed from the bank, less about $3,000

deposited to a checking account. The CD in the amount of $254,000.00 was wrongfully pledged as collateral for the commercial loans to Threaded Steel.

Later the Bank off-set this large CD to pay a commercial loan owed to the Bank. In his deposition Sheffield testified that he was aware that the funds from the large Southwestern Life Insurance Company check were initially deposited into the large CD which were then wired to InterFirst Bank in Beaumont and the funds were merely rewired back from InterFirst to State Bank through another Houston Bank.

Mike Ames, trustee, was served with certain Requests for Admissions. These Requests were challenged with the asserted privilege afforded to Mike Ames by the Fifth Amendment to the Constitution of the United States. Mike Ames, by a Motion in Limine, clearly set forth that he declined to answer questions which answers may tend to incriminate the person answering the questions; namely, Mike Ames.

Upon reviewing and analyzing the record, we conclude the district court fell into error in denying the plaintiffs-appellants' Motion for Judgment Notwithstanding the Verdict as to State Bank. The reason for finding error is that the evidence, we conclude, establishes and proves that the funds in the certificate of deposit No. 28793 were actually profit-sharing funds that belonged to the plaintiffs and the State Bank knew it. The record establishes that the State Bank added to the funds that had been "re-remitted" to it from the InterFirst Bank sufficient amounts to raise the total in the certificate of deposit to $254,000.00, the original amount of the profit-sharing CD.

The amount of this CD was equal to the account that had been previously opened with funds directly from the Southwestern Life Insurance Company in the names of the plaintiffs, R.E. Ames and R.G. Ames. The State Bank converted this CD to pay off the loans and a letter of credit made by Threaded Steel.

The State Bank's officer knew or should have known that the funds on deposit in the CD were the profit-sharing

trust funds. The record shows that these funds were, in fact, the two plaintiffs' profit-sharing trust funds and R.E. and R.G. Ames have established the identity and the tracing of these funds, we think, virtually as a matter of law. We decide that under the proper standards and criteria of review that the jury's verdict concerning these funds is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951); *Potter v. Garner*, 407 S.W.2d 537 (Tex.Civ.App.—Tyler, 1966, writ ref'd n.r. e.); *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986).

In summary, the evidence proves that the profit-sharing funds of the plaintiffs were taken by Mike Ames as trustee and placed on deposit at the State Bank. Then these same funds were transferred to InterFirst Bank in Beaumont and the funds were forthwith returned from InterFirst Bank to State Bank. These same monies were then placed in a new certificate of deposit in the name of Mike Ames, Trustee, in the amount of $254,000.00, the same amount that was previously transferred to InterFirst Bank.

### Crucial Facts in the Record

In November Mike Ames opened a bank account in Heights Bank and did so by a check from Southwestern Life Insurance Company in the amount of $424,888.35. The entire $424,888.35 was profit-sharing trust money. State Bank had notice of this fact. At that time, *Mike Ames told Sheffield that he, Ames, was the sole Trustee of the profit sharing plan, the trust fund pension plans, for Threaded Steel Products.* $254,000.00 of the $424,888.35 was directly deposited into a checking account styled R.E., R.G., and R.L. Ames with Mike Ames, Trustee, as the signer. *Then $156,500.00 of the $424,888.35 was used to purchase the certificate of deposit in the name of Threaded Steel Products Company Employees' Profit–Sharing Distribution account and $13,741.00 was deposited into a checking account under the name of Threaded Steel Products Company*

*Employees' Profit–Sharing Distribution Account. The $13,741.00 was subsequently distributed to a group of employees who were in the profit sharing plan of which the Bank had notice.* In January of '83 Mike Ames wired funds from the InterFirst Bank–Beaumont to State Bank through the First City Bank, Houston, in the amount of $157,895.02. At that time, Mike Ames purchased the CD in the amount of $254,000.00 in his name as Trustee. The Bank had notice that it was issued in the name of Mike Ames as Trustee. The Bank and its senior lending officer Sheffield had notice that Mike Ames was sole Trustee for the plan. The CD was in the total amount of $254,000.00 which in turn represented $157,895.02 plus an additional $100,000.00 which Mike Ames, trustee, obtained from the bank less about $3,000 placed in a checking account. These facts were testified to by Mr. Sheffield. Then in the spring of '83, the Bank converted this CD to pay off the commercial loans. The banker admitted that the monies that were in the certificate of deposit had been issued to the fiduciary trustee; but these monies were actually used to pay off commercial loans. A letter of credit in favor of Threaded Steel Products was also paid. Hence, the record clearly demonstrates the Bank utilized known profit-sharing trust funds belonging to employees to retire commercial loans to Threaded Steel. The banker further admitted that neither R.G. nor R.E. Ames had ever given any type of permission to use their trust fund pension benefits as collateral for commercial loans.

Mike Ames, Trustee, wrote a draft in the amount of $254,646.02 on account number 80–17565 payable to the order of the InterFirst Bank of Beaumont. The reason for the said check, stated on its face, was to purchase a certificate of deposit for R.E., R.G., R.M. and R.L. Ames' portion of the Threaded Steel Products profit-sharing plan. The State Bank had notice of this as clearly proved by Plaintiffs' Exhibit 10.

About two weeks later, on December 1, 1982, Mike Ames, together with an attorney as secretary and counsel for Threaded Steel, and R.L. Ames, vice-president of Threaded Steel, met as the Threaded Steel corporate board of directors. They adopted a corporate resolution giving Mike Ames individually [not as trustee] the authority from the corporation only—not from the beneficiaries of the plan—"to sign any and all checks, drafts, orders against any funds at any time standing in the credit of Threaded Steel and said bank, Heights State Bank, and/or against my account with Heights that an account shall be established in the name of this corporation with the Heights State Bank. That said Bank is hereby authorized to honor any and all checks so signed including those drawn to the individual order of such officer without further inquiry or regard to the authority of the said officer to use such checks or the proceeds thereof or remain singly as authorized to borrow on behalf of this corporation from said Bank and to execute ... for the repayment of any sums so borrowed, ... and to pledge ... as security ... property...." These resolutions *dealing with corporation funds as distinguished from Trustee funds were drawn on the forms submitted by the State Bank. The resolutions consistently speak of any property or funds that belonged to the corporation.* Mr. Sheffield testified that his bank required such a resolution and such a form be completed and *signed before a corporation placed its money* into an account with the Bank.

Even though the senior vice-president of State Bank testified that he had no dealings with Mike Ames between November 17, 1982 and January 20, 1983; nevertheless, there exists in the record a form provided by the Bank and the commercial lending department thereof, which was a corporate resolution. *This resolution did not pertain to the Profit–Sharing Plan in any manner.*

### A Summary

In sum, the record is clear that Mike Ames first attempted to have dealings with the State Bank in September of 1982, contacting Mr. James E. Sheffield. Mr. Sheffield was a senior vice-president of Heights Bank in charge of commercial lending. A loan application was made and delivered in

September of '82 by Mike Ames in behalf of Threaded Steel Products Company for the sum of $180,000.00. That loan request was refused. The reason for refusal was that Threaded Steel was in a poor, distressed financial condition. Threaded Steel accounting records reflected three consecutive years of heavy financial losses. Then on November 16, 1982, Mike Ames opened an account with State Bank and *it is particularly salient and crucial that the account was opened with a check from Southwestern Life Insurance Company that represented the then total assets of the Threaded Steel Products profit-sharing plan.* The Bank knew this. This check was in the amount of $424,888.35. At that time Mike Ames told Mr. Sheffield that *Mike Ames was the sole trustee of the Threaded Steel profit-sharing plan which was also a type of pension plan for the Threaded Steel employees. Approximately $175,000.00 was disbursed to other eligible individuals as participant of the profit sharing plan.* The Bank knew of these facts.

In September of '82 when the first application for a loan was made, the banker recalled that the company was apparently heavily engaged in litigation. The banker unequivocally acknowledged that Mike Ames told him when the Southwestern Life Insurance Company check was deposited in Heights State Bank that Mike Ames was acting as the sole trustee of the profit-sharing plan of Threaded Steel Products. The only significant history that the State Bank had with Mike Ames was as a trustee and that he was the sole trustee for the profit sharing plan. Under the totality of the circumstances of the record it appears irrefutable that the bank had to realize the nature of the trusteeship of Mike Ames was as sole trustee for the profit-sharing plan.

The profit-sharing plan and its trust monies were flagrantly violated. For example, on February 3, 1983, $50,000 was advanced to Threaded Steel which was wired to InterFirst Bank of Beaumont and *the $50,000 was wired directly to the account of Threaded Steel Products, a corporation, at the InterFirst Bank.* Then on

February 7, an additional $54,000 was wired. Shortly thereafter there was an additional letter of credit drawn in favor of a firm known as Alcan Metal Goods or Alcan Aluminum in the amount of forty-two thousand plus dollars. By July of '83 the Bank had fully converted the CD to pay the commercial loans and debts of Threaded Steel. The Bank unequivocally acknowledged through its chief commercial loan officer that the relevant CD was issued to Mike Ames as trustee. Sheffield was asked: "You are aware that some of the funds from Southwestern Life check that initially was deposited over here were wired to InterFirst and funds were wired back from InterFirst?" Sheffield's answer was an unequivocal "yes".

Sheffield acknowledged that the *corporate resolutions were for the benefit of the corporation.* It is clear that the corporate resolutions on the forms supplied by the State Bank did not empower the corporation or the Bank to use profit sharing trust funds as collateral or to be used as an offset for defaulted commercial loans to Threaded Steel Products.

*There are simply no provisions in the corporate resolutions (which were unequivocally affirmed by Mr. Sheffield during cross examination) that conferred any authority or power at all for Mike Ames to use the profit sharing trust funds* on behalf of the corporation to secure commercial loans. The Bank had notice of this. We find this: Questions by Mr. Almquist:

"Q. Mr. Sheffield, turning back to the Corporate Resolution, can you refer to us—show us any place in that Corporate Resolution where they discuss what authority Mr. R.M. Ames [Mike] has with respect to the pension or profit sharing benefits?

"A. *There's none whatsoever.*

"Q. *None at all?*

"A. *Not in the Corporate Resolution. That refers to Threaded Steel Products, a corporate entity.*

"Q. *With respect to the Corporate Resolution, where does it say that Mike*

*Ames can set up an account in the names of R.M. Ames, Trustee, or conduct activities in the name R.M. Ames, Trustee?*

"A. *I have no documentation to that effect, at least in this file.*

....

"Q. *In fact, there are two (2) points there that it says "R.M. Ames, Singly," doesn't it?*

"A. *No.*

"Q. *On the Corporate Resolution where they've typed in his name.*

"A. *R.M. Ames. R.M. Ames, what, Sr.?*

"Q. *Singly.*

"A. *Oh, singly.*

"Q. *S-i-n-g-l-y.*

"A. *Yes, I'm sorry.*

"Q. *That's the way it's typed in on two (2) places there; is that right?*

"A. *Yeah.*"

The banker stated that it was common to have proper documentation when dealing with trusts or with trustees. We also find this:

"Q. Let me look at one (1) other items over here. When Mr. Winchester was drawing this up here a little while ago, he wrote down a figure of one fifty-seven (157). Actually, what we're talking about in money that came in was one five seven eight nine five 'o' two (15789502); is that right?

"A. Let me go back and refer to that. That's correct.

"Q. Okay. And, to that, the bank put ninety-six thousand one 'o' four ninety-eight (96,104.98); is that right?

"A. Uh-huh (yes), yeah.

"Q. So, when you got to this R.M. Ames, Trustee CD, the amount of the CD is two hundred and fifty-four thousand dollars ($254,000.00); is that right?

"A. That's correct.

"Q. *And, Mr. Sheffield, that is the same figure that went out of Heights State Bank on November 18th, 1982, isn't it, sir?*

"A. *Yes.*"

Thus because of the chronology of events, because of the similarity of the figures, because of the fact that Mike Ames acted as Trustee, because of the fact that the only trustee capacity which Mike Ames told the bank was his capacity as trustee for the pension and profit sharing plan, because of the shortness of the duration of the times involved in the chronology, we hold that the verdict of the jury is against the great weight and preponderance of the evidence.

A landmark, definitive case on the issue of the Bank's duty to the beneficiary of a trust in connection with the misbehavior of the fiduciary trustee is *United States Fidelity & Guaranty Company v. Adoue & Lobit*, 104 Tex. 379, 137 S.W. 648, *aff'd on reh.*, 104 Tex. 379, 138 S.W. 383 (1911). The Court wrote as follows, in relevant part:

"But if the bank has notice or knowledge that a breach of trust is being committed by an improper withdrawal of funds, or if it participates in the profits or fruits of the fraud, then it will be undoubtedly liable."

137 S.W. at 653.

The United States Court of Appeals for the Fifth Circuit applied Texas law in a diversity of citizenship case, in *South Central Livestock Dealers v. Security State Bank*, 551 F.2d 1346 (5th Cir.1977), *modified on other grounds and aff'm on reh.* 614 F.2d 1056 (5th Cir.1980). The Fifth Circuit wrote upon litigation involving out-of-state cattle investors who brought an action against a Texas bank on a claim of wrongful offset and tortious interference with contractual relations. The Fifth Circuit Court, in relevant part, wrote:

"Texas has long held that if a bank knows that deposits by a debtor in his own name are in fact held by him in a fiduciary capacity, then the bank may not apply such funds to the individual indebtedness of the debtor."

551 F.2d at 1349. Indeed, in our case, the funds were constantly held in the name of the trustee.

### The Appeal of R.M. (Mike) Ames, Trustee

Mike Ames appeals from the judgment against him. This judgment is in favor of R.E. and R.G. Ames. Generally, a trustee, in our jurisdiction, shall exercise the judgment, care and prudence that persons of ordinary prudence, discretion and intelligence would exercise in the management of their own affairs when the said trustee is supervising and managing trust property. *See TEX.PROP.CODE ANN. Sec. 113.056(a)* Vernon 1984. Hornbook law establishes that a fiduciary relation exists between a trustee and the beneficiaries of his trust and such fiduciary relationship must not be breached or violated. In *Maykus v. First City Realty and Financial Corp.*, 518 S.W.2d 887, 892 (Tex. Civ.App.—Dallas 1974, no writ), the court wrote:

> "The actions of such a party must be judged not by the morals of the market place, but by 'the punctilio of an honor the most sensitive.' ..."

The law of trusts is well settled that a trustee owes to his beneficiaries an unwavering duty of good faith, fair dealing, loyalty and fidelity over the affairs of the trust and its corpus. Certainly, a trustee is not permitted to co-mingle trust funds with either personal funds or corporation funds in order to obtain commercial loans from banks. *See Pershing v. Henry*, 236 S.W. 213, (Tex.Civ.App.—Amarillo 1921), *aff'd* 255 S.W. 382 (Tex.Comm'n App.1923, judgmt adopted).

The record is clear that the Appellee, Mike Ames, was a personal trustee of the funds of the profit-sharing plan. *He was not a trustee of, or for, the corporation named Threaded Steel Products Company.* A trustee may not lend trust funds to himself or to an affiliate. *TEX. PROP.CODE ANN. Sec. 113.052(a)* (Vernon 1984). Nor may the trustee lend trust funds to the trustee's employer or to a director, officer or employee of the trustee. And, so long as a person acts as a trustee, that person has the obligations and duties of a fiduciary. *Maykus, supra. See* 4 A. Scott, *Law of Trusts*, Sec. 334, at 2644–48,

(3rd Ed.1967). *See Smith v. Bolin*, 153 Tex. 486, 271 S.W.2d 93 (1954). A trustee is definitely required to conduct himself, in his trustee affairs, with scrupulous good faith and fidelity when dealing with the interests of his beneficiary. It is equally imperative upon a trustee, in his dealings with the trust property, not to use the trust property, corpus or income in his own private business. The trustee must not make any incidental profits for himself, nor is he to acquire or obtain any pecuniary gain from his high, fiduciary position. This is true because the beneficiary is entitled to claim the advantages gained by the fiduciary relationship and to hold the trustee chargeable for losses occurring from the violation of the trustee's fiduciary duties. *Pershing v. Henry*, 236 S.W. 213 (Tex.Civ. App.—Amarillo 1921) *aff'd* 255 S.W.2d 382 (Tex.Comm'n App.1923, judgmt adopted).

Moreover, if a trustee converts the trust fund or the trust corpus into a different form of property, either taking into himself the title or placing the title in a corporation, the trustee has breached and violated his trust. *Hand v. Errington*, 242 S.W. 722 (Tex.Comm'n App., Sec. A, 1922, judgmt adopted).

The chancery courts have adopted a well-settled principle of equity that, when a relationship of trustee and cestui que trust once arises, it pervades every transaction respecting the trust. *Hand v. Errington, supra.*

Moreover, we perceive that the Appellants had and have the right to receive their share of the proceeds of the large check from Southwestern Life Insurance Company as long as the same were identifiable or traceable—as they were here—into the CD issued by the State Bank and have that CD in the name of Mike Ames, trustee, impressed with their rights as cestuis que trust.

It should be noted that, when the attorney for the Appellants asked Mike Ames whether or not he, as Trustee, obtained a fidelity bond or surety bond when he took over the plan, Mike declined to answer the question. It was announced by Mike's attorney that Mike Ames would invoke the

Fifth Amendment privilege against giving answers which might tend towards some sort of self-incrimination. The attorney for Mike Ames announced that he had so advised his client as to any questions pertaining to the operation of the plan or its administration during the period of time Mike Ames served as Trustee. Thereafter, the Trustee, Mike Ames refused to answer the questions on about 32 different occasions, with answers reading:

"A. I'm not going to answer the question." Or, "I will not answer that question", or answers that were very similar in wording.

After a lengthy line of questions by the Appellants' attorney, which were certainly relevant and material, seeking important information, the Trustee was finally asked:

"Q. With respect to the questions that I have asked today that you refused to answer—and I think your attorney has cleared this up earlier, but just for the record—you are invoking your Fifth Amendment right as the basis for refusing to answer these questions?

"A. Yes."

Mike was also asked:

"A. Where are the funds of the Threaded Steel Products employees' profit sharing plan located at the present time?

"A. I won't answer the question.

. . . .

"Q. Mr. Ames, you have consulted with your attorneys here. Have you decided to change your answers or to answer any of the questions that have been asked today?

"A. No."

### The Effect and Requirements of Pool v. Ford Motor Co.

In *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986), the court wrote:

"Our continuing review of courts of appeals decisions in which factual insufficiency points are discussed convinces us that the overwhelming majority of those opinions represent honest efforts by their scriveners to adhere to the guidelines of *In re King's Estate....*"

"In order that this court may in the future determine if a correct standard of review of factual insufficiency points has been utilized, courts of appeals, when reversing on insufficiency grounds, should, in their opinions, *detail the evidence relevant to the issue in consideration and clearly state why the jury's finding is factually insufficient or is so against the great weight and preponderance as to be manifestly unjust....*"

In this opinion, we have attempted to follow the Supreme Court, in *Pool, supra;* and, hence, this opinion has been lengthy. Indeed, we have tried to set out, in detail, and by actual quotes from the record, the contrary evidence that so greatly outweighs the evidence, if any probative evidence does exist, in support of the verdict below. The startling fact is that, right up the very end, the State Bank off-set ordinary, delinquent commercial loans, made as business loans, for the benefit of Threaded Steel. The Bank off-set those bad loans against funds standing in the name of a trustee and the exhibits clearly show this. The Bank knew the nature of the Trusteeship of Mike Ames, being the sole trustee of the profit-sharing plan and the nature of the funds as being profit-sharing funds belonging to the beneficiaries. Mike never told the bank differently. We decide, regardless of whether the bank could somehow attempt to claim it did not know exactly who the beneficiaries were, that that was no excuse to off-set an ordinary commercial loan made to Threaded Steel against trust fund monies held in the name of the trustee. From past dealings, the Bank had to know that there was no trustee for Threaded Steel and that Mike Ames was the sole trustee for the beneficiaries of the profit sharing plan and the pension plan.

One very startling fact is that the certificate of deposit with the State Bank, dated February 28, 1983, in the amount of $159,914.06 (Plaintiff's Exhibit No. 7), certified that the money was on account with the bank for the Threaded Steel Products Co.,

Employees Profit Sharing Disbursement Account and that certificate of deposit had a maturity date of March 30, 1983, and the certificate of deposit affirmatively showed R.M. Ames, as Trustee for the Employees Profit Sharing Disbursement Account. This $159,914.06 was disbursed to the employees of Threaded Steel.

When the banker was testifying about the $157,000, the very language of the questions and the very wording of his answers makes it clear that he was talking about the same $157,000 that was transferred to InterFirst Bank of Beaumont and then retransferred to the State Bank.

In passing upon the issue of whether the verdict was against the great weight and preponderance of the evidence, under this record, it is necessary for us to examine, the actual wording used in the questions to and answers of the banker and the other witnesses. It is glaringly clear that the initial $157,895.02 fund was definitely a portion of the profit sharing and pension plan. Under this record, it can be definitely deduced that the $157,895.02 was part of the amount that was taken out of the profit sharing plan in the Heights State Bank in Houston, and wired to the InterFirst Bank of Beaumont, and, within a short time, this amount of money was by wire retransferred to the Heights State Bank. This money was put in a certificate of deposit in the name of R.M. "Mike" Ames, Trustee. The Heights State Bank had to know that, at least $157,895.02, was sacred trust funds. It must be borne in mind that the banker admitted that, out of the $424,888.35, a sum of $156,500 was used to purchase an original certificate of deposit in the name of the Employees Profit Sharing Distribution Account. Certainly the language and wording of the questions and answers, indicate that the banker agreed and knew that the $157,895.02 was money that was transferred back and had its origin in the $254,000 certificate of deposit which was marked and definitely identified as part of the Profit Sharing Plan. Indeed, Heights State Bank makes this unequivocal statement, in its brief:

"The Appellants somehow want the Court to infer that the funds in C.D.

28793 belong to the Appellants because there had been an earlier certificate of deposit in the same amount, which apparently did belong to a profit-sharing plan...."

We think such an "inference" is altogether syllogistic. It is, indeed, inescapable. We decide these facts are more than an inference.

### The Jurisdictional Issue

■■■ We further hold that the federal statute which specifically governs the pension and profit-sharing plans, being *29 U.S.C. Secs. 1132*, et seq., (1985 & Supp. 1988), especially provides that a participant in the plan has the election to bring his action in the state court to recover his benefits due to him under the terms of his plan. *29 U.S.C. Sec. 1132(a)(1)(B)* (1985). *29 U.S.C. Sec. 1132(e)* (1985) specifically provides:

"State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under subsections (a)(1)(B) of this section."

And *Sec. 1132(a)(1)(B)* provides that a civil action may be brought by a participant or beneficiary to recover benefits under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the plan. Hence, the federal law specifically mandates that state courts "shall have concurrent jurisdiction". This language is clear and unambiguous. We sanguinely overrule the contention and point of error of Mike Ames that the state court did not have competent jurisdiction to try this litigation.

The sole basis of the appeal in the brief of R.M. "Mike" Ames, the Trustee, is based on the contention that the state district court did not have jurisdiction either before trial, after the receipt of evidence, or after the verdict was returned. Under the pleadings of R.E. Ames and R.G. Ames, and under the record, these participants and beneficiaries of the plan were certainly trying to recover benefits due to them under the terms of the plan as well as to enforce

their rights under the terms of the plan. *29 U.S.C. Sec. 1132(a)(1)(B)* (1985).

 Generally, the ERISA preempts any state law which *attempts to directly regulate or moderate the contents or operations of the plan.* However, if a cause of action is brought in state court to enforce the terms and to enforce and recover the benefits of a retirement plan or a profit-sharing plan, such an action shall not be deemed to be preempted by ERISA. *Lukus v. Westinghouse Elec. Corp.*, 276 Pa. Super. 232, 419 A.2d 431 (1980).

The trustee, Mike Ames concedes in his brief that Section 1132(a)(1)(B) encompasses actions for the violation of terms of a profit-sharing benefit plan, citing *Sams v. N.L. Industries, Inc.*, 735 S.W.2d 486 (Tex. App.—Houston [1st Dist.] 1987, no writ). Here the Appellants R.E. and R.G. Ames are *asserting their rights under the plan.* *See Odgen v. Michigan Bell Tel. Co.*, 595 F.Supp. 961, 966 (E.D.Mich.1984). Trustee Mike Ames also concedes that actions under Subsection (a)(1)(B) recognizes suits to recover benefits under a plan.

 It should be borne in mind that, in Plaintiffs' Second Amended Petition, the live, trial pleading, R.E. Ames and R.G. Ames pleaded that *the plan had been terminated and that the Plaintiffs, in their Second Amended Petition, pleaded for their monies which had been converted and that R.M. "Mike" Ames, as well as the Heights State Bank, were guilty of the tort of conversion and, in so doing, Mike Ames had acted with malice or gross negligence.* By pleading the tort of conversion, as done here, we perceive that that was an additional cause of action or trial allegation, giving the State trial court the jurisdiction.

We determine that the appeal taken by Mike Ames was for delay and without sufficient cause. We award R.E. Ames an additional five (5) percent of the amount of the jury verdict in his favor. We award R.G. Ames an additional five (5) percent of the amount of the jury verdict in his favor. Furthermore, we award an additional five (5) percent of the punitive damages. The interest on these additional awards pursuant to *TEX.R.APP.P. 84* will begin to run from the date of this Opinion and thereafter until paid.

*Query: What disposition should a Court of Appeals order under this record?*

We feel constrained, and, indeed, we are constrained, to follow the very recent case of *Cropper v. Caterpillar Tractor Company*, 754 S.W.2d 646 (Tex.1988), delivered by Justice James P. Wallace.

Justice Wallace wrote:

"... [W]e decide whether a court of appeals has the authority to remand a cause for a new trial when it concludes that a jury's failure to find in favor of a party on a particular issue is 'against the great weight and preponderance of the evidence.' We hold that a court of appeals has the authority to review a 'failure to find' in the same manner in which it may review a jury's findings. TEX. CONST., art. V, Sec. 6. We further hold that this review does not violate the right of trial by jury. TEX.CONST., art. I, sec. 15.

. . . .

"The jury answered all issues favorably to Cropper, including the following defensive issue submitted at Caterpillar's request:

"Was ANTHONY CROPPER Negligent in the operation of the Water Wagon on the occasion in question? "ANSWER: No."

Quoting further, at page 648:

"The Texas Constitution confers upon the court of appeals 'appellate jurisdiction ... under such restrictions and regulations as may be prescribed by law,' and further provides that 'the decision of said courts shall be conclusive upon all questions of fact brought before them by appeal or error.' TEX. CONST. art. V, sec. 6. These two clauses have independent significance, and have quite different consequences upon the allocation of jurisdiction between this court and the intermediate appellate courts.... The latter, which will be referred to as the

'factual conclusivity clause,' functions not as a grant of authority to the courts of appeals but as a limitation upon the judicial authority of this court. *Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69 (Tex.1898)."

Quoting further, at page 648:

"II.

"The authority of the courts of appeal to review a 'non-finding.'

"In *Pool v. Ford Motor Co.*, 715 S.W. 2d 629 (Tex.1986), the court recently intimated in *dicta* that there might be some distinction between view of findings and non-findings. While recognizing that the constitution empowers courts to 'unfind' a jury's findings, the court observed that it was 'more difficult to rationalize' why a non-finding should be reviewable under a great weight and preponderance standard. 715 S.W.2d at 634. This difference between findings and non-findings had previously been described as a 'distinction which exists in semantics and theory only but which does not exist in reality.' *Dyson v. Olin Corp.*, 692 S.W. 2d 456, 458 (Tex.1985) (Robertson, J., concurring). If there is any inference in *Pool* that there is a distinction between review of findings and review of non-findings, we lay that question to rest."

Hence, we follow *Cropper, supra; Herbert v. Herbert*, 754 S.W.2d 141 (Tex.1988), being No. C–4986, opinion by Justice Kilgarlin, and *Pool v. Ford Motor Co., supra.*

■ Thus, we reverse the judgment in favor of the bank against R.E. and R.G. Ames and remand that cause of action for a new trial on the whole merits of the case. We order that this reversal of that part of the judgment below, and this remand, is severed from the remainder of this appeal. We concede that the recitation of the facts and the narratives from the record in this opinion have been somewhat lengthy. We maintain that this was necessary because of the directives contained in *Pool v. Ford Motor Co., supra.* The Supreme Court's opinion speaks of a jury's finding, but *Cropper, supra,* makes it clear that the

same standard of review should be applied to a non-finding.

Further, the Supreme Court wrote that the Courts of Appeal, in their opinions, should state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict. We have followed this directive. *See* Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 TEX.L.REV. 361 (1960).

We find virtually no evidence of significant probative value that supports the verdict as to the Bank. It is correct that the loan officer did, on the stand, testify somewhat differently from the testimony that he gave in his deposition.

Having severed part of this appeal as to the State Bank, we affirm the judgment in favor of R.E. Ames and R.G. Ames against R.M. "Mike" Ames, adding the five (5) percent as set out above pursuant to *TEX.R. APP.P. 84.*

AFFIRMED IN PART AND REFORMED, with the Affirmance being severed from the balance of the Appeal; REVERSED IN PART AND REMANDED, with the Reversed part remanded for a new trial.

BURGESS, Justice, concurring and dissenting.

I concur in the substantive result of the case, but respectfully dissent to the imposition of a five percent penalty under *TEX.R. APP.P. 84.*

The majority finds that the appeal was brought "for delay and without sufficient cause." I do not believe the jurisdictional question had been fully resolved by our Texas courts, and in fact, the trial judge must also have been of that opinion when he stated:

THE COURT: Counsel, I don't intend to cut you short. I'm going to overrule the Defendant, Mike Ames' Motion for Instructed Verdict. With regard to this Motion to Dismiss in a written Motion, I have not gone and read these cases, this multitude of cases that you've cited in this thing. But, just for the record, and this is worth zero, I think it's absolutely

 

ridiculous that this question appears to be so unclear, even to federal courts, as to what state courts can and cannot do. And, the matter to me, and this may be a serious oversimplification of the problem, is that they probably need to state that state courts cannot hear any matter regarding Employee Retirement Income Security Act cases, period. But, I don't know whether I have jurisdiction or not. I just want to state that for posterity. I don't think I'll ever know. I'm going to overrule the Motion to Dismiss it, and we'll see what they have to say about this case. We'll give them another one to write on.

Appellant should not now be penalized when the trial court invited, in a manner of speaking, appellate review. Therefore, I respectfully dissent to the imposition of the penalty.